COMMONWEALTH vs. JAMES K. MEECH.

Middlesex.    January 8, 1980. — April 29, 1980.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, LIACOS, & ABRAMS, JJ.

*Evidence,* Previous testimony of unavailable witness, Hearsay, Expert
   opinion, Other offense. *Witness,* Unavailability, Expert. *Homicide.*
   *Grand Jury. Insanity.*

At a criminal trial, the judge did not err in refusing to admit in evidence
   the grand jury testimony of an unavailable witness where the Com-
   monwealth had not been in the position of cross-examiner at the grand
   jury hearing and where there was no substantial identity between the
   issues on which the witness was examined before the grand jury and
   the issue on which the defendant predicated his request that the
   testimony be admitted. [493-498]
At a murder trial, references to the defendant's prior incarcerations were
   not so prejudicial as to invalidate the trial where the references were
   made in relation to the defendant's prior mental history which he had
   raised in connection with his insanity defense. [498-499]

INDICTMENTS found and returned in the Superior Court
on February 24, 1978.

The cases were tried before *Tamburello, J.*

*Matthew H. Feinberg* for the defendant.

*Susan A. Ghetti,* Legal Assistant to the District Attorney,
for the Commonwealth.

KAPLAN, J.   The defendant James K. Meech did not deny
that he killed Edward Gerke in a Lowell rooming house in
the early evening of January 7, 1978, but he put in issue his
criminal responsibility at the time. A jury found him guilty
of murder in the first degree, as well as assault and battery
with a dangerous weapon.   He brings his appeal pursuant to
G. L. c. 278, §§ 33A-33G, and Mass. R. A. P. 1B inserted
by 378 Mass. 924 (effective July 1, 1979),[1] claiming that the

--------

[1] See *Commonwealth* v. *Davis, ante* 1, 12-17 (1980).

judge erred in excluding the grand jury testimony of a witness who died before trial, and in permitting repeated references by prosecution witnesses to the defendant's prior incarcerations. We outline the circumstances of the homicide and the testimony of expert witnesses as a background for the questions presented.

The victim's body was found about 9 p.m., January 7. His throat had been cut. There was testimony that the defendant had been drinking with the victim and arguing with him about money earlier that day. The defendant was seen wielding a knife and stabbing superficially another resident of the rooming house that afternoon. A knife with a distinctive handle belonging to the defendant was recovered in the evening without difficulty not far from the house. It was covered with blood.

Barbara McLaughlin, the defendant's sister, testified that the defendant, intoxicated and unruly, appeared at her apartment in North Billerica about 7 p.m. His clothes were stained with blood. He had arrived by taxi which he apparently had summoned from a bar near the murder scene. To McLaughlin and her friend Kenneth Moody the defendant volunteered that he "had cut [a] guy's throat." Concerned about her children seeing the defendant in his dishevelled condition, McLaughlin urged the defendant to clean himself, which, after awhile, he did. He washed and changed and told Moody to burn his discarded clothes. Instead, Moody placed them in a back hall outside the apartment. The defendant fell asleep about 10:30 p.m. and did not awaken until 3 a.m., just before the arrival of the police.

Detective Lt. Thomas Spartachino of the State police made the arrest shortly after 3 a.m. After Miranda warnings the defendant denied acquaintance with the victim. But McLaughlin handed the discarded clothes to the police. Taken to the Lowell police station, the defendant agreed to submit to a benzidine test which, when applied to his hands and forearms, indicated the presence of blood. At this point the defendant asked to speak privately with Spartachino, to whom he offered to tell the "whole story" in exchange for a

promise of favor. (The police received no statement from the defendant.)

At trial, the Commonwealth showed that the blood on the defendant's clothing and knife was type A, the victim's type, not the defendant's. Two bloody fingerprints were found on a beer can in the defendant's room. The prints were the defendant's; the blood was type A.

To turn to the testimony of experts at the trial, the defendant offered Harold Willey, principal psychologist at Bridgewater State Hospital, who had several times dealt with the defendant since 1971, and during that period had supervised four separate appraisals of the defendant by means of the Minnesota Multiphasic Personality Inventory test. Willey concluded that the defendant showed signs of a borderline personality which could lapse into paranoid schizophrenia (typified by delusions and distortions of reality) when under stress. Dr. James J. Gilligan, a psychiatrist and medical director at Bridgewater State Hospital, after two interviews with the defendant and a study of his Bridgewater record together with a reading of police reports of the defendant's conduct after the killing, concluded that the defendant suffered from chronic and severe paranoid schizophrenia,[2] although earlier he had been a psychopath and at times could even now be in touch with reality. He thought alcohol could increase the defendant's vulnerability to psychotic delusions. Dr. Gilligan ended by testifying that the defendant was criminally irresponsible under the *McHoul*[3] standard at the time of the homicide. A similar judgment was expressed by Dr. Jerome Rogoff, associate chief of psychiatry and chief of in-patient psychiatry at Faulkner Hospital, who also took note of the defendant's actions after the homicidal event.

On its part the Commonwealth suggested that the defendant was responsible for the acts on January 7, 1978, and

---

[2] In describing the killing, the defendant said in effect he had been controlled by demonic forces at the time and his mind had become separated from his body.

[3] *Commonwealth* v. *McHoul,* 352 Mass. 544 (1967).

was feigning mental illness. Dr. Martin Kelly, a psychiatrist at Peter Bent Brigham Hospital, held that the defendant displayed a personality disorder, but that it was of the antisocial type, not the paranoid schizophrenic. Thus criminal responsibility remained. Upon his review of the defendant's history in correctional institutions, Dr. Kelly found that the defendant had repeatedly attempted to manipulate himself out of M.C.I. Walpole and into the Bridgewater hospital. Dr. James Donovan, a clinical psychologist at Peter Bent Brigham, reevaluated the test data used by Willey. He testified that three of the four tests were invalid because the defendant had either failed to answer a sufficient number of questions or had answered falsely (according to the test's built-in validation scales). Contradicting Willey, Dr. Donovan thought the most recent test (the only one the witness thought valid) indicated an antisocial personality.

1. John McDonald testified before the grand jury that he encountered the defendant outside the rooming house between 7:30 to 8 P.M. the night of the homicide. The defendant's pants pockets were shredded and his hands bloody. McDonald and the defendant went back into the house and shared some beer. They were together a short time. The defendant threatened McDonald with a knife (McDonald thought, by reference to a newspaper picture, that it was the same as the one recovered) and made homosexual advances toward him.[4]

This grand jury testimony, given a month and a half after McDonald told essentially the same story to the police, was offered by the defendant at trial in order to establish the defendant's criminal irresponsibility — more particularly, his indifference or callousness just after the homicide.

Conceding that McDonald's statement, offered by the defendant through a reading of the grand jury transcript, had

---

[4] The witness said he then fled the room yelling, "Meech, you're loony." Even if McDonald's statement were otherwise admissible, this quoted comment could properly be excluded. See Commonwealth v. Spencer, 212 Mass. 438, 447 (1912).

the character of hearsay, the defendant argues that it should have been admitted here under the "prior recorded testimony" exception to the rule barring hearsay. The common model for the exception is one where the prior testimony was given by a person, now unavailable, in a proceeding addressed to substantially the same issues as in the current proceeding, with reasonable opportunity and similar motivation on the prior occasion for cross-examination of the declarant by the party against whom the testimony is now being offered. See *Commonwealth* v. *Canon*, 373 Mass. 494, 500 (1977); McCormick, Evidence §§ 255-257 (2d ed. 1972). In some prior cases, we have thus allowed a carry-over of testimony from one criminal trial to a later criminal trial (see *Commonwealth* v. *Clark*, 363 Mass. 467, 470 [1973]; *Commonwealth* v. *Gallo*, 275 Mass. 320, 328-334 [1931]), and from a preliminary hearing to the trial. See *Commonwealth* v. *Caine*, 366 Mass. 366, 371-372 (1974); *Commonwealth* v. *Mustone*, 353 Mass. 490, 492-493 (1968).

The usual formula would not be fulfilled if grand jury testimony were subsequently offered against the indicted defendant, for he would not have had a chance to cross-examine. See *United States* v. *Fiore*, 443 F.2d 112, 115 & n.3 (2d Cir. 1971), cert. denied, 410 U.S. 984 (1973).[5] Nor is it nominally fulfilled where, as here, the defendant offers the testimony against the Commonwealth, for the Commonwealth was not in the position of a cross-examiner at the grand jury hearing; rather it was presenting the testimony through direct examination. However, it has been recommended by commentators,[6] and on occasion held by courts,[7] that a party's having tendered the testimony on

---

[5] Also his Sixth Amendment right of confrontation would be offended. See *Pointer* v. *Texas*, 380 U.S. 400, 403-406 (1965). But see note 12, *infra*.

[6] See McCormick, Evidence § 256 (2d ed. 1972); 4 J. Weinstein & M. Berger, Evidence par. 804(b)(1)[03] (1978); 5 J. Wigmore, Evidence § 1389 (Chadbourn rev. 1974).

[7] See, e.g., *Dwyer* v. *State*, 154 Me. 179, 183-186 (1958); *Louisville & N. Ry.* v. *Scott*, 232 Ala. 284, 288 (1936). Cf. *Commonwealth* v. *Canon*, 373 Mass. 494, 499-501 (1977). See also Fed. R. Evid. 804(b)(1) which

direct should serve as the equivalent for the present purpose of his having cross-examined upon it. There is some support for this view as to grand jury testimony on the theory, perhaps, that the government should be considered bound to the trustworthiness of the evidence it chose to present to the grand jury as a basis for an accusation of crime.[8] (See, however, note 12 *infra*.)

But even if the proposition were accepted that the defendant might in some circumstances use the grand jury testimony of a now unavailable witness at trial, McDonald's testimony would still be of dubious acceptability. For it is an important ground of this hearsay "exception" that there be substantial identity between the issues at the earlier and later proceedings — this to ensure "that the former handling of the witness was the equivalent of what would now be done if the opportunity were presented."[9] Where this similarity is absent, the testimony will not be fortified in the material respect — that is, in its relation to the particular proposition sought to be proved in the later proceeding. See *United States* v. *Wingate*, 520 F.2d 309, 316 (2d Cir. 1975); *State* v. *Augustine*, 252 La. 983, 999 (1968). The problem is encountered here. The Commonwealth's purpose in examining McDonald before the grand jury was not to inquire in-

---

provides: "(b) Hearsay exceptions. — The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: (1) Former testimony. — Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

[8] See *United States* v. *Henry*, 448 F. Supp. 819, 821 (D.N.J. 1978); *United States* v. *Driscoll*, 445 F. Supp. 864, 866-867 (D.N.J. 1978) (both applying rule 804(b)(1) to grand jury testimony offered by defendant). See also *Commonwealth* v. *Shagoury*, 6 Mass. App. Ct. 584, 596 (1978) (assumption of admissibility).

[9] The quotation is from the Advisory Committee's notes to Fed. R. Evid. 804(b)(1), see note 6, *supra;* the stress is on the words "similar motive" in the text of that rule. See *Commonwealth* v. *Canon*, 373 Mass. 494, 512 (1977) (Liacos, J., dissenting).

to the defendant's criminal responsibility; it was to provide eyewitness proof about the defendant's possession of the supposed murder weapon in the vicinity of the crime near the time of death.

It should be added here that the difficulties attaching to the admission of the McDonald testimony were not relieved when it was offered, alternatively, through the defendant's experts who had recourse to it in reaching their conclusions about the defendant's mental condition. (Actually only Dr. Rogoff made such recourse.) The fact that an expert uses hearsay to ground an opinion does not render the hearsay admissible. *National Bank of Commerce* v. *New Bedford,* 175 Mass. 257, 261 (1900) (Holmes, C.J.). See also *Wing* v. *Commonwealth,* 359 Mass. 286, 290 (1971); *Commonwealth* v. *Kendall,* 9 Mass. App. Ct. 152, 157 (1980).[10]

On this appeal the defendant offers a basis for admission of the McDonald testimony that was not put to the judge below. He refers by analogy to Fed. R. Evid. 804(b)(5), set out in the margin,[11] embodying what we have called an

---

[10] Compare Fed. R. Evid. 703 (Bases of Opinion Testimony by Experts) and discussion in S. Saltzburg & K. Redden, Federal Rules of Evidence Manual 426-427 (2d ed. 1979); McElhaney, Expert Witnesses and the Federal Rules of Evidence, 28 Mercer L. Rev. 463, 482 (1977).

The defendant relegates to a footnote in his brief a claim that McDonald's statement to the police should have been admitted, but he says the argument for its admissibility "would be subsumed by the stronger arguments for the more technically trustworthy grand jury minutes." At trial the defendant suggested that the report should be admitted under the "business records" exception. G. L. c. 233, § 78. The judge did not err in refusing the suggestion. See *Kelly* v. *O'Neil,* 1 Mass. App. Ct. 313, 316-317 (1973); *Johnson* v. *Lutz,* 253 N.Y. 124, 127-129 (1930).

[11] Under the heading "Hearsay Exceptions; Declarant Unavailable," Fed. R. Evid. 804(b)(5) reads: "Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in

"innominate" exception to the hearsay rule applicable in Federal courts. *Commonwealth* v. *White,* 370 Mass. 703, 713 (1976). We have not adopted any such rule; the matter is one falling to a committee now in the process of proposing rules of evidence for adoption by this court. But we do not regard the common law hearsay exceptions as frozen in their established contours, and have been prepared on suitable occasions to venture forth. The cited Federal rule, however, would not help the defendant with McDonald's grand jury testimony. The application of such a rule is very much in the discretion of the trial judge, to be exercised in the light of his familiarity with the whole array of the evidence. Here we do not have the benefit of so intimate an analysis; in such circumstances it would be strange indeed to reverse a conviction for the judge's failure to admit the hearsay. See *Commonwealth* v. *White, supra.* Cf. *Solomon* v. *Dabrowski,* 295 Mass. 358, 359-360 (1936); *Huff* v. *White Motor Corp.,* 609 F.2d 286, 290 n.2 (7th Cir. 1979). Further, the hearsay, to be admitted, must be (quoting from the rule) "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." But here there was other evidence equally if not more probative of the defendant's indifference to his own violent act, and to that extent supportive of a theory of paranoid schizophrenia — for example, his drinking beer with bloodied hands after the event; leaving the knife in open view; making no effort to clean up before calling a cab to his sister's house, or for some time after arriving there.[12]

---

advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant."

[12] There is also a question whether the McDonald statement had "equivalent circumstantial guarantees of trustworthiness" (i.e., equivalent to those attaching to stated exceptions to the hearsay rule). The defendant never mentioned the encounter with McDonald in accounts he gave of the crime and his subsequent actions. For the insistence on corroboration of hearsay offered under the innominate exception, see *United States* v. *Garner,* 574 F.2d 1141, 1143-1146 (4th Cir.), cert. denied, 439 U.S. 936 (1978); *United States* v. *West,* 574 F.2d 1131, 1135-1136 (4th Cir. 1978)

Indeed it appears, finally, that if for any reason there is conceived to have been error in the judge's exclusion of the McDonald testimony, the error would be insignificant, for it would have resulted only in barring evidence which was at most merely cumulative. See *Commonwealth* v. *Capalbo,* 308 Mass. 376, 382-383 (1941).

2. The defendant complained of undue references in the evidence introduced by the Commonwealth to his prior incarcerations. But, in the first place, the defendant through his expert witnesses had already mentioned some of this history, and could not complain of the Commonwealth's repetition or elaboration. See *Commonwealth* v. *Capalbo, supra.* See also *Commonwealth* v. *Hanley,* 337 Mass. 384, 394-395 (1958). Second, these sorts of references came in naturally and necessarily in the testimony of Dr. Kelly when he was developing his theme that the defendant was feigning insanity and was being manipulative now as he had been in the past. See *Commonwealth* v. *Sheppard,* 313 Mass. 590, 607 (1943). The fact that evidence suggests prior criminality does not itself disqualify it if it is probative of another relevant proposition. See *Commonwealth* v. *Chalifoux,* 362 Mass. 811, 815-816 (1973).

Workers at the Solomon Mental Health Center who had seen the defendant during a seven-month period preceding the homicide, and correction officers who had observed him in the last month, were called to show the defendant's condition of mind shortly before the crime (see *Commonwealth* v. *Sheppard, supra* at 606-607) and that the defendant's participation in counseling at the Center was not voluntary but rather a condition of parole. This testimony necessarily reflected the defendant's earlier criminality. If there was some excess here that could have been eliminated, it cannot be considered prejudicial in relation to all else that had come in.

(both instances of grand jury testimony offered by the government at trial; as to the Sixth Amendment problem, see Justice Stewart's dissent from the Court's denial of certiorari in *Garner,* in which he expressed "grave doubts" regarding the admissibility of the testimony. 439 U.S. at 938).

The same may be said of the prosecutor's opening remarks in which the defendant was pictured as saying to Spartachino at the time of the arrest that he would tell everything in exchange for a promise that he would be sentenced to Concord, not Walpole. When Spartachino was testifying on direct, the reference to Walpole was excluded, but when recalled on rebuttal, Spartachino recurred to the full statement. The judge denied a motion for mistrial and instructed the jury to disregard the testimony. It may be that the testimony could claim relevance on the question of the defendant's manipulative trait. But if the testimony be thought objectionable, it did not invalidate the trial. In this connection as in respect to the other claims of prejudice, we point not only to the inevitable induration of the case with the defendant's previous embroilments with the law, but also to the fact that the focus throughout the trial was on the question of mental condition, not on the degree of the defendant's propensity for the commission of crime.

We have examined the record as required by G. L. c. 278, § 33E, and see no basis for mitigation or new trial.

*Judgments affirmed.*