COMMONWEALTH vs. CURTIS McIRVING JOHNSON.

Worcester. April 6, 2001. - September 14, 2001.

Present: MARSHALL, C.J., SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Homicide. Intent. Malice. Constitutional Law,* Assistance of counsel, Confrontation of witnesses. *Practice, Criminal,* Assistance of counsel, Multiple defenses, Argument by counsel, Argument by prosecutor, Voir dire, Capital case. *Evidence,* Hearsay, Identification, Cross-examination, Intent.

At a trial for murder in the first degree on the theory of deliberate premeditation, evidence that the defendant shot the victim after shooting at least one other person and used a weapon that required pulling the trigger or cocking the hammer to fire each time constituted sufficient evidence to support a finding of deliberate premeditation. [118-119]

At a trial for murder in the first degree on the theory of deliberate premeditation, the trial judge's inclusion in instructions to the jury of the second and third prongs of malice permitted the jury to convict under the standard applicable to second degree murder or under an erroneous standard similar to the proof required for involuntary manslaughter, thereby creating a substantial likelihood of a miscarriage of justice; the fact that the evidence warranted a finding that the defendant killed with deliberate premeditation did not mitigate the inadequacy in the charge, which relieved the prosecution of its burden to prove deliberate premeditation beyond a reasonable doubt. [121-122]

At a criminal trial, counsel's failure to conduct a more thorough examination of the effect of a witness's illnesses and medications on the witness's ability to identify the defendant did not deprive the defendant of an otherwise available and substantial ground of defense, where the remainder of the identification testimony was sufficiently convincing; similarly, counsel's waiver at trial of an objection raised during the witness's deposition regarding the effect of the witness's medication on the witness's ability to identify the defendant did not amount to ineffective assistance of counsel, given the other strong identification evidence. [123-127]

At a criminal trial, counsel's mounting of the dual defenses of misidentification and mental impairment did not constitute ineffective assistance of counsel, where the record and the defendant's affidavit established that the defendant agreed with counsel on how to present the defenses after consultation regarding the potential problems. [128-129]

At a criminal trial, defense counsel's omission from the opening statement of any discussion of the evidence supporting the defense of misidentification, while focusing on the expected expert testimony concerning mental impairment, was consistent with the defense's strategy of attacking the

prosecution's identification evidence by means of cross-examination [129-130]; counsel's description of the defendant as "antisocial" and "typified by a lack of remorse" was not tantamount to an admission of the defendant's guilt or an abdication of the defendant's position, where counsel took pains to avoid the suggestion that presentation of evidence concerning the defendant's personality meant that the defendant had committed the crimes and told the jury that they could only consider the defendant's intent if they first concluded that the defendant had committed the crimes [130-131].

At a criminal trial, counsel's omission from closing argument of evidence supporting a defense of mental impairment was consistent with the defense's chosen strategy of primarily attempting to undermine the strength of the prosecution's identification witnesses, and secondarily relying on the defense of mental impairment should the misidentification defense be rejected, and did not amount to ineffective assistance of counsel. [131]

At a criminal trial, the prosecutor's use during closing argument of statements made by the defendant to a defense expert as part of a dual defense strategy did not mean that presentation of that strategy constituted ineffective assistance of counsel, where the defense counsel objected to the prosecutor's reference to those statements and the court, in response, instructed the jury that the evidence from the defense expert could only be used for consideration as to the defendant's mental impairment or mental condition. [131-132]

At a criminal trial, the decision of defense counsel to conduct a voir dire of a witness on the issue of the voluntariness of statements made by the defendant to the witness did not constitute ineffective assistance of counsel, despite the fact that the witness's repudiation of earlier testimony under oath raised a Fifth Amendment issue and rendered her unavailable to provide testimony beneficial to the defense, where the strategy was not manifestly unreasonable, given that counsel was unaware what the witness might say and was successful in preventing the admission of damaging admissions made by the defendant. [132-134]

At a criminal trial, the admission of the prior recorded testimony of a witness regarding the defendant's statements did not violate the defendant's right to confront the witness, where the defendant's counsel had had the opportunity to cross-examine the witness during voir dire; counsel's motivation during that cross-examination was addressed to substantially the same issues as in the trial, in that counsel was seeking in both instances to determine whether the defendant had made the statements at all, given the recantation by the witness of earlier testimony on the subject. [134-135]

INDICTMENTS found and returned in the Superior Court Department on November 15, 1991.

The cases were tried before *James P. Donohue,* J., and a motion for a new trial was heard by him.

*Wendy H. Sibbison* for the defendant.

*Harry D. Quick, III*, Assistant District Attorney (*Timothy J. Smyth*, Assistant District Attorney, with him) for the Commonwealth.

COWIN, J. The defendant was convicted by a jury of murder in the first degree of Robert Domiano, Jr., on the theory of deliberate premeditation. He was also convicted of assault with intent to murder John Ellison; assault with intent to murder Albert Toney, III[1] ; assault and battery by means of a dangerous weapon on both Ellison and Toney; unlawful possession of a firearm; unlawful possession of ammunition; and carrying a firearm without authority.[2]

The defendant appeals from his convictions and from the denial by the trial judge of his motion for a new trial. On appeal, the defendant makes the following claims: (1) there was insufficient evidence of deliberate premeditation of the murder of Domiano; (2) the judge erroneously instructed the jury regarding the intent necessary for premeditated murder; (3) the judge's instructions on the third prong of malice were erroneous; (4) trial counsel was ineffective (a) for failing to investigate the impact of John Ellison's illnesses and medication on the reliability of his identification; (b) in the manner in which he "mounted" the dual defenses of misidentification and mental impairment based on "explosive personality disorder"; and (c) in requesting a voir dire of a witness, Jannie Bynum, when he knew she was not likely to testify, and when the voir dire resulted in the preservation of her testimony for trial. The defendant further contends (5) that the prosecutor made an improper statement in closing argument; and (6) the judge erred in admitting, as prior recorded testimony, Bynum's voir dire testimony. Finally, the defendant requests that, if we do not order a new trial, we exercise our extraordinary power under

---

[1]Domiano, Ellison, and Toney were friends who were in a group the defendant encountered on the night in question.

[2]The three firearms convictions were placed on file with the defendant's consent and are not before us on appeal. See *Commonwealth* v. *Dahl*, 430 Mass. 813, 814 n.1 (2000).

G. L. c. 278, § 33E, to reduce the murder verdict to murder in the second degree.[3]

We conclude that the jury instructions in regard to the intent necessary for deliberately premeditated murder created a substantial likelihood that a miscarriage of justice has occurred, and therefore, we reverse the defendant's conviction of murder in the first degree and remand that indictment for a new trial. We affirm the remaining convictions and the denial of the motion for a new trial as it relates to those convictions.

*Facts.* We summarize the facts in the light most favorable to the Commonwealth, leaving the recitation of other facts to discussion in conjunction with the issues raised. On the afternoon of September 28, 1991, the defendant, accompanied by Bynum, his girl friend's mother, and his friend, Daniel Dade, traveled to Worcester by bus to visit Bynum's sister, Mary Railey, and her family at 2 Crystal Street (Railey residence). Prior to the bus trip, Dade witnessed the defendant drinking a "64-ounce" container of beer and three "wine coolers." Bynum, who saw the defendant at her home in Springfield at about 4 P.M., observed the defendant consuming a "big" bottle of beer. During the trip to Worcester, Bynum and Dade noted that the defendant was "talking loud," "running off on the mouth," and talking "nonsense."

The defendant and his companions arrived at the Railey residence in Worcester shortly after 8 P.M. The defendant continued drinking while he socialized with Dade; Jannie Bynum's son, Ronald Bynum; Edwin Montalvo; and Rahim Kodjo. At one point, the group of young men went for a drive in Kodjo's gray Toyota automobile. During the ride, Montalvo took out a gun to show the others; the defendant briefly touched the weapon, and Montalvo placed it back under his shirt.

The young men returned to the Railey residence at approximately midnight. As the defendant stepped out of the car, he fell into the bushes and Dade helped free him. About fifteen

---

[3]With the exception of his arguments that there was insufficient evidence of deliberate premeditation and that the judge erred in admitting as prior recorded testimony the voir dire testimony of Jannie Bynum, and his request for review under G. L. c. 278, § 33E, the defendant raised all of the same claims in his motion for a new trial.

minutes later, when the group decided to order Chinese food, the defendant attempted to stand up from his chair, but, according to both Dade and Bynum, he fell to the floor. Bynum helped the defendant to his feet. Noticing that the defendant was "swinging" as he stood and more intoxicated than earlier, Bynum asked him to remain at the house. The defendant refused, and with Kodjo, Montalvo, and Ronald, proceeded to Ding Ho, a Chinese restaurant in Worcester.

At the front counter of the restaurant, the owner, John Ng, refused to serve the group. A dispute erupted that escalated to yelling. The defendant spat on the owner. A waitress testified that the defendant looked "stoned or drunk."

While the defendant was arguing with John Ng, an off-duty police officer, Albert Toney, and a group of his friends who had been eating in the dining area of the restaurant were walking toward the cash register area. This group included Robert Domiano, John Ellison, Veronica Joyce, William Hackett, and Paul Ferraro. Toney saw the defendant yelling at John Ng, who was refusing to serve the defendant's group and repeatedly asking the young men to leave.

When Toney saw the defendant spit, he showed the defendant his badge and identified himself as a police officer. The defendant turned to Toney and said, "You ain't no f——— police officer." Toney again identified himself as a police officer, and the defendant repeated, "You ain't no f——— police officer." Toney directed the defendant and his friends to leave the restaurant and the defendant retorted, "You ain't no real police officer." A brief argument ensued during which the defendant was loud, aggressive, and moving around. Toney told the defendant's companions to "take him out of here," and they did so.

Minutes later, as the Toney party left the restaurant, they noticed the defendant and his friends standing a short distance away. The Toney group turned in the opposite direction and the defendant yelled after them, "You f——— cops," or "You ain't no f——— cops." After walking approximately twenty feet, Toney, Joyce, and Ellison heard footsteps running behind them. They turned and saw the defendant about five feet away raising a handgun. The defendant pointed the gun at, verbally

addressed, and then in rapid succession shot Toney, Domiano, and Ellison, each with one shot.[4] After the shootings, the defendant ran back down the street, jumped into Kodjo's Toyota with his companions, and raced from the scene. Domiano died as a result of his gunshot wounds; Toney and Ellison survived.

Shortly before 1 A.M., Jesus Novoa (Novoa), an off-duty Southbridge police officer, observed the defendant and two other males enter another Chinese restaurant in Worcester. Novoa, who was picking up his own order of food, noted that the defendant showed visible signs of intoxication. His eyes were glassy and bloodshot; and he appeared unsteady on his feet.[5]

1. *Sufficiency of the Evidence of Deliberate Premeditation.* The defendant challenges the sufficiency of the evidence regarding the element of deliberate premeditation and maintains that, although there may have been sufficient evidence that the defendant planned to shoot Toney, the police officer, the evidence was insufficient as a matter of law that the defendant deliberately premeditated the killing of Domiano. We examine the evidence introduced up to the time the Commonwealth rested its case, *Commonwealth* v. *Borans*, 379 Mass. 117, 134 (1979), and apply the well-established test "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979). We conclude that there was sufficient evidence of premeditation to warrant submitting the case to the jury on the question whether the defendant committed the murder with deliberate premeditation.[6]

"Deliberate premeditation means that the plan to kill was

---

[4]There was conflicting testimony whether Toney or Ellison was shot first, but no doubt that Domiano was shot directly after Toney.

[5]At the time, Novoa was unaware of the shooting. He contacted the Worcester police after reading newspaper coverage of the shooting.

[6]A motion for a required finding was filed at the close of the Commonwealth's case as well as at the close of all the evidence. Since the motion at the close of the Commonwealth's case was properly denied, we consider whether anything in the remainder of the case caused a deterioration of the Commonwealth's position such that the motion at the close of the evidence should have been allowed. See *Commonwealth* v. *Basch*, 386 Mass. 620, 622 & n.2 (1982). The motion at the close of the evidence was properly denied.

formed after deliberation and reflection. However, no particular length of time is required in order for deliberate premeditation to be found." *Commonwealth* v. *Palmariello*, 392 Mass. 126, 143 (1984), quoting *Commonwealth* v. *Caine*, 366 Mass. 366, 374 (1974). It may be a matter of days, hours, or even seconds. "It is not so much a matter of time as of logical sequence. First the deliberation and premeditation, then the resolution to kill, and lastly the killing in pursuance of the resolution; and all this may occur in a few seconds." *Commonwealth* v. *Palmariello*, *supra*, quoting *Commonwealth* v. *Tucker*, 189 Mass. 457, 495 (1905). See *Commonwealth* v. *Chipman*, 418 Mass. 262, 269 (1994). Obtaining and using a weapon at close range, particularly a gun, is "sufficient generally to permit an inference of premeditation." *Commonwealth* v. *Stewart*, 398 Mass. 535, 541 (1986).

The jurors could find that the defendant, angry after an argument with Toney in the restaurant, obtained a handgun and then waited for Toney and his friends to emerge from the restaurant. The defendant then taunted them and ran after them, brandishing the weapon. Ellison, seeing the gun in the defendant's hand, said, "Hey, listen, we are not looking for trouble here." The defendant responded, "You want one of these too?" and shot Ellison. Turning to Toney, the defendant said, "You ain't no f——— cop," and shot him. As Toney fell, Domiano reached out to grab him and break the fall. The defendant then turned to Domiano, asked, "Are you a f——— cop, too?," and shot Domiano. The evidence indicated that the weapon used in the shooting was a .32 caliber revolver which required manually pulling the trigger or cocking the hammer to fire each shot. The fact that the defendant shot Domiano after shooting at least one other person (see note 4, *supra*) and used a weapon that required pulling the trigger or cocking the hammer to fire each time is sufficient evidence to support a finding of deliberate premeditation.

2. *Intent for Premeditated Murder.* Only the first prong of malice can support a conviction of deliberately premeditated murder. See *Commonwealth* v. *Simpson*, 434 Mass. 570, 578 (2001), and cases cited. The judge here failed to so inform the jury. The judge then compounded this error by including within

his definition of deliberate premeditation the second and third prongs of malice.[7] The jurors sought clarification on this point. During deliberations, they asked the judge: "Please clarify murder first-degree [and] murder second-degree, definition-distinction between the two." The judge repeated the erroneous instruction he had given earlier.

Objections to these errors in the instructions on malice were not properly preserved,[8] see *Commonwealth* v. *LeClair*, 429 Mass. 313, 316 (1999), and the judge did not resurrect them as he declined to consider them substantively in ruling on the defendant's motion for a new trial, see *Commonwealth* v. *Hallet*, 427 Mass. 552, 554 (1998). Therefore, our review is limited to whether the error created a substantial likelihood of a miscarriage of justice. See G. L. c. 278, § 33E; *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163-164 (1998); *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992). We conclude that the error did create a substantial likelihood of a miscarriage of justice.

The Commonwealth argues that this case is similar to other cases involving erroneous instructions on malice. In such cases,

---

[7]"Now, in order to convict a defendant of murder in the first degree, the Commonwealth must prove that the defendant unjustifiably killed another, and that he specifically intended to kill *or to do grievous injury or bodily harm to that person, or that he intended to do an act creating a plain and strong likelihood that the victim's death or grievous harm would follow.* And the Commonwealth must also prove that the defendant acted with deliberate premeditation. Deliberate premeditation is an essential element of murder in the first degree. And the Commonwealth must prove that the defendant's resolution to kill was the product of cool reflection. Deliberately premeditated malice aforethought requires proof of a specific intent, and I have just earlier described or defined that for you.

"The intention to kill *or to do grievous bodily harm, or to do an act creating a plain and strong likelihood that the victim's death or grievous bodily harm would follow,* must precede the act of the slaying. Deliberate premeditation means that that plan or the intention to kill, *or to do bodily harm, or to do an act creating a plain and strong likelihood that death or grievous bodily harm would follow,* that so-called murderous intent, that plan to murder was formed after deliberation and reflection. While some portion of time is essential, no continuing length of time is required for deliberate premeditation to be found." (Emphases supplied.)

[8]At a charge conference, the defendant requested an instruction that included only the first prong of malice. The judge indicated that he would not give the requested instruction. No objection was made at trial to the erroneous instruction that was given. See *Commonwealth* v. *LeClair*, 429 Mass. 313, 316 (1999).

we have held that, despite the erroneous malice instructions, the judge's explanation of deliberate premeditation focused the jury on the necessity of finding the specific intent to kill in order to find deliberate premeditation. In those cases, the instructions read as a whole clearly conveyed to the jury the requirement of finding an intent to kill; thus there was no risk of conviction based on a mental state other than the first prong of malice. See, e.g., *Commonwealth* v. *Simpson, supra* at 588 & n.13 (no substantial likelihood of miscarriage of justice from instruction on three prongs of malice when judge also informed jury that deliberate premeditation included plan to murder, decision to kill after period of deliberation, and resolution to kill as product of cool reflection); *Commonwealth* v. *Squailia*, 429 Mass. 101, 107 (1999) (no substantial likelihood of miscarriage of justice where trial judge defined all three prongs of malice but also informed jury that deliberate premeditation required specific intent to kill victim); *Commonwealth* v. *Jenks*, 426 Mass. 582, 585 (1998) (no substantial likelihood of miscarriage of justice where jury charge on deliberate premeditation clearly informed jury of need to find specific intent to kill).

In contrast to the above cases, here the judge did not clearly inform the jury that they must find the plan, the decision to kill after a period of deliberation, and then the resolution to kill. Rather, he intermingled within his definition of deliberate premeditation the erroneous second and third prongs of malice,[9] thus expressly permitting the jury to convict the defendant of murder on the theory of deliberate premeditation if they concluded that the defendant intended "to do grievous bodily harm," intent which would be sufficient for murder in the second degree, or "to do an act creating a plain and strong likelihood that death or grievous bodily harm would follow," an erroneous definition of the third prong of malice that is similar to the proof required for involuntary manslaughter. *Commonwealth* v. *Vizcarrondo*, 427 Mass. 392, 395-397 (1998), *S.C.*, 431 Mass. 360 (2000). Further, the error was repeated in the judge's

---

[9]Moreover, the judge's definition of third prong malice was incorrect. *Commonwealth* v. *Vizcarrondo*, 427 Mass. 392, 395-396 (1998), *S.C.*, 431 Mass. 360 (2000) (discussing error in inclusion of grievous bodily harm language in definition of third prong malice).

supplemental instructions. The last definition the jurors heard was thus wrong.

The Commonwealth contends that any error should not require reversal of the conviction because the evidence warranted a finding that the defendant killed the victim with deliberate premeditation. Although such a finding was warranted, as previously discussed, any inadequacy in the charge is not thereby mitigated. Particularly here where mental impairment was a live issue, with erroneous instructions we do not know whether the jury concluded that deliberate premeditation existed based on an intent to kill, or on one of the other prongs of malice. "The charge relieved the Commonwealth of its burden to prove deliberate premeditation beyond a reasonable doubt. We cannot assume in fairness that the error made no difference in the jury's verdict." *Commonwealth* v. *Lennon*, 399 Mass. 443, 448 (1987).[10] The errors in the charge created a substantial likelihood of a miscarriage of justice. See *id.* at 446-449. The conviction on that indictment must be reversed for that reason.[11]

3. *Ineffective Assistance of Counsel.* The defendant claims that his trial counsel was ineffective in three respects: (a) his failure to investigate fully the impact of Ellison's illnesses and medications on the reliability of his identification, (b) his "manner of mounting" the dual defenses of mistaken identification and mental impairment, and (c) his adoption of a manifestly unreasonable strategy concerning damaging hearsay testimony of Jannie Bynum. Despite the fact that we reverse the convic-

---

[10]Although the defendant does not make the argument, pursuant to our obligation to conduct a review pursuant to G. L. c. 278, § 33E, we note that the judge also included the "frame of mind" language which was disapproved in *Commonwealth* v. *Eagles*, 419 Mass. 825, 836 (1995). (The judge instructed: "Now, malice aforethought refers to a frame of mind which includes not only anger, hatred and revenge, but also any other unlawful and unjustifiable motive.") As this case was tried years before the *Eagles* decision, the judge did not have the benefit of that case. The use of the improper "frame of mind" language which could lead a jury to believe that anger, hatred, revenge, or a selfish, wrongful mood is enough to show malice further supports our conclusion that a miscarriage of justice may have occurred from incorrect instructions.

[11]Neither the Commonwealth nor the defendant requested that for this reason we reduce the verdict to murder in the second degree. Cf. *Commonwealth* v. *Lennon*, 399 Mass. 443, 449-450 (1987).

tion of murder in the first degree, we consider the remaining claims because they affect the defendant's other convictions.

The defendant raised these same issues in a motion for a new trial that was denied by the trial judge. The decision on a motion for a new trial lies within the sound discretion of the judge and will not be reversed unless it is manifestly unjust or the trial was infected with prejudicial constitutional error. *Commonwealth* v. *Nieves*, 429 Mass. 763, 770 (1999), and cases cited. We extend special deference to the action of a motion judge who was also the trial judge. *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986).

We apply the standard of *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974), in reviewing the remaining non-capital convictions. See *Commonwealth* v. *Plant*, 417 Mass. 704, 716-717 (1994). A defendant must demonstrate a "serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." In regard to the latter requirement, "there ought to be some showing that better work might have accomplished something material for the defense." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977).

(a) The defendant first claims that trial counsel was ineffective for failing to investigate fully the impact of Ellison's illnesses and medications on the reliability of his identification. Even if counsel should have developed this line of inquiry more completely, it is clear, as the judge concluded, that, given the identification evidence of other witnesses, the defendant was not deprived of an otherwise available defense. *Commonwealth* v. *Saferian, supra* at 96. We summarize the trial testimony regarding the identification of the defendant by these other witnesses in order to determine whether a failure on counsel's part, if any, had an effect on the outcome. Two witnesses, Toney and Ellison, actually identified the defendant as the shooter. (Their testimony is discussed in some detail below.) In addition, substantial other evidence, considered together, established that the defendant was the shooter. The relationship of Ellison's

testimony to other identification testimony is the focal point of this issue on appeal, and we recount Ellison's testimony only after reviewing all of the other identification evidence.

The bartender at the Ding Ho restaurant, Hon Wong, identified the defendant as the spitter who argued with Toney after Toney had identified himself as a police officer. Donna Dennett, a waitress at the restaurant, also identified the defendant as the person in the altercation with John Ng and Toney at the cash register area. Wong and Dennett each testified that, several days after the shooting, they had selected the defendant's photograph from an array as the person involved in the confrontation inside the restaurant. Joyce, a member of the Toney group, testified that the spitter was also the shooter. Neither Wong, Dennett, nor Joyce identified the defendant as the shooter, but their testimony, considered together, did.

The defendant was also identified by his clothing. The defendant's friend, Dade, testified that when the group left for the Ding Ho, the defendant was wearing a baseball hat, jeans, a black T-shirt and jean jacket; none of the other members of the group were wearing this type of clothing.[12] According to Joyce, the spitter was wearing dark baggy[13] blue jeans and a blue jean jacket. Ferraro stated that the shooter was wearing a loose-fitting, baggy jacket and baggy pants. Wong described the defendant as wearing a jean jacket and jean pants. Hackett, another member of Toney's group, testified that the shooter wore a light blue baseball hat, baggy pants and a jean jacket.

In addition to the above identification testimony, Toney identified the defendant at trial as the spitter, the individual who taunted the Toney group as they left the restaurant, and as the shooter. The circumstances leading to Toney's identification (which were in evidence) were as follows: On October 2, Detective Stanley Niedzwiecki showed Toney a photographic array that included the defendant's photograph. Toney, who had been

---

[12]Dade described Montalvo as wearing a sweater with a baseball shirt over it and a hat turned backward; Ronald was wearing a Red Sox "warm-up" jacket; and Kodjo wore a leather jacket over "casual" shirt and slacks.

[13]Lisa Railey, Mary Railey's daughter, who saw the defendant earlier in the evening when he arrived at the Railey residence, described the defendant as wearing a loose, "over-sized" jean jacket and jeans and a hooded sweatshirt.

five feet from the defendant and was looking at the defendant's face at the time of the shooting, selected the defendant's photograph as the man that confronted and spat on John Ng at the Ding Ho. When asked if the shooter was the same person, Toney said, "It looks like him, but I want to be one hundred per cent sure." Toney then broke down, and Detective Niedzwiecki ended the interview.[14] On November 22, Detective Niedzwiecki met with Toney at the Worcester police station to take his statement. While Detective Niedzwiecki was away from his desk, Toney looked through an envelope that contained a photographic array. Toney picked out the defendant's photograph and, after Detective Niedzwiecki returned to the desk, said, "This is the man that shot me."[15]

The Commonwealth took Ellison's testimony by deposition prior to trial because he was afflicted with HIV, had developed AIDS, and was not expected to live until the date of trial. The deposition was held at a courthouse approximately four months after the shooting and included a lineup. A videotape of the deposition was played at trial and included the following evidence. At the time of the shooting, Ellison, approximately three feet from the defendant and looking directly at his face, said, "Hey, listen, we are not looking for trouble." Ellison stated that, after being shot, he watched the defendant shoot Toney. Ellison identified the defendant as the individual arguing with Toney at the Ding Ho and as the shooter and selected the defendant at the lineup.[16]

Trial counsel cross-examined Ellison regarding the fact that

---

[14]Previously, when viewing an array without a photograph of the defendant, Toney picked out a picture of a black male not involved in the shooting and said, "This is not the man, but this looks like the man that had the gun." Joyce and Ferraro, who also viewed arrays without the defendant's photograph, each picked out the same photograph as resembling the shooter that Toney did, but each also said that the person in that photograph was not the shooter.

[15]Toney testified that, although previously he may have stated to the contrary, he had not looked at any newspaper articles concerning the defendant's involvement in the case. Toney further said that he had not seen a picture of the defendant prior to his identification at the police station.

[16]The deposition testimony also included the fact that on October 2, 1991, approximately four days after the shooting, Ellison reviewed a photographic array from his hospital bed, picked up a photograph of the defendant and said: "Bingo, this is the guy that shot me." When asked if he was positive, Ellison

on the night of the shooting he had just been discharged from a hospital and was using prescribed medication (Fentanyl patches); and that at the time of the October 2, 1992, photographic array he was taking other medication (Fentanyl and Dilaudid).

In support of his motion for a new trial, the defendant submitted an affidavit from Dr. Robert Weitzman, a family practitioner with experience in emergency medicine and AIDS. Dr. Weitzman reviewed Ellison's medical record, which documented Ellison's deteriorated physical condition as a result of advanced AIDS.[17] The medical record also indicated the medications Ellison received for his AIDS condition.[18] Dr. Weitzman opined that, to a reasonable degree of medical certainty, Ellison had a substantial impairment of his "cognition and memory" on the night of the shooting and "a very significant impairment of cognition and memory" during his identification of the shooter on October 2, 1991. Trial counsel conceded in his affidavit that he should have questioned Ellison during his deposition regarding his medications, his use of cocaine, and their effect on his cognitive capacities.

In ruling on the motion for a new trial, the judge concluded that trial counsel's omission did not prejudice the defendant because he had cross-examined Ellison at the deposition and exposed weaknesses in his testimony. The judge further

said: "This is the guy that shot me, shot [Domiano], shot Al Toney. I'll never forget it."

[17]Dr. Weitzman described records indicating that Ellison had been diagnosed with HIV retinitis in both eyes and AIDS encephalopathy. Dr. Weitzman stated that HIV retinitis "causes vision loss in people with advanced AIDS," and that AIDS encephalopathy is "a dementing [sic] process characterized by atrophy (shrinkage) of the brain and cognitive impairment (including memory disorders)." Dr. Weitzman further averred that a "CT scan" showed that Ellison's brain had atrophied, and that a neuropsychological evaluation revealed "significant cognitive defects."

[18]Dr. Weitzman reviewed all the medications prescribed to Ellison on his discharge from the hospital on the day of the shooting. Of these medications, Weitzman identified four (Fentanyl, Dilaudid, Scopolamine, and Haldol) that had "potential" negative effects, including delirium, hallucinations, disorientation, impairment of mental and physical performance, mental cloudiness, blurred vision, and other visual disturbances. Dr. Weitzman noted that on the day of Ellison's photographic identification of the defendant, Ellison was still receiving all the above medications except Haldol.

concluded that Ellison's deposition was merely cumulative of the testimony of other witnesses, Hackett and Joyce.[19] We agree that Ellison's consumption of drugs, both prescribed and otherwise, provided much fodder for challenging that witness's perception, memory, and identification. We nevertheless reach the same conclusion as the judge: given the identification evidence of other witnesses, the failure to use the available evidence further to cross-examine Ellison does not amount to ineffective assistance of counsel.

We so conclude because even if more thorough examination of Ellison's drug condition would have totally discredited Ellison in the minds of the jury, the remainder of the identification testimony was sufficiently convincing that the defendant has not likely been deprived of an otherwise available, substantial ground of defense. *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). In short, there has been no showing that better work might have accomplished something material for the defense. *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977).

The defendant claims that a related error was counsel's decision to waive an objection he had made during Ellison's deposition testimony. At the deposition, when Ellison was asked whether the medication he was on, Fentanyl and Dilaudid, hindered his ability to make the photographic identification, defense counsel objected to the question. The defendant contends on appeal that, if counsel had pressed this objection at trial, the judge would have ruled in his favor, because expert testimony was necessary to establish the impact of these medications on Ellison's ability to identify the defendant. Without regard to whether expert testimony was required, see *Commonwealth* v. *Lloyd*, 45 Mass. App. Ct. 931, 932-933 (1998), quoting *Commonwealth* v. *Williams*, 25 Mass. App. Ct. 210, 218 (1997) (expert required to explain effects of prescription medication on perception and memory), we again conclude that given the other strong identification evidence, the failure to pursue the objection does not amount to ineffective assistance of counsel in this case.

---

[19]The judge's statement that Hackett and Joyce both identified the defendant as the shooter is incorrect. At trial, only Toney and Ellison (by videotape deposition) identified the defendant as the shooter.

(b) *Dual defenses.* The defendant next maintains that counsel was ineffective in the manner in which he mounted the dual defenses of misidentification (the defendant's chosen defense) and the defense of mental impairment (the attorney's preference).[20] Specifically, he contends that counsel (a) failed to warn him of "the risks inherent in mounting a hybrid defense based on [these] contradictory theories" so that he could make a knowing decision as to these defenses; (b) omitted from his opening statement any discussion of the evidence supporting the defendant's chosen defense, misidentification; and (c) did not discuss in his closing argument the evidence supporting the attorney's preferred defense, mental impairment. The defendant also contends that the dual defense strategy allowed the prosecutor, during closing argument, improperly to use the statements made by the defendant to the defense expert for substantive purposes.[21]

The defendant claims that he is entitled to choose the nature of his defense and that he could do so in a meaningful manner only if counsel thoroughly explained the potential problems of the defenses. The judge concluded that the defendant consented to the dual defense strategy with a "complete understanding" of its inherent difficulties.

The judge's conclusion is supported by the record. It is clear from the affidavits of trial counsel and the defendant that the attorney and his client discussed several times the potential aspects of the defenses and the advantages and deficiencies of each. It is also evident that the defendant, with an understanding of the issues involved, controlled the decisions about how the case would proceed. The affidavits reveal the following. In regard to the mental impairment defense the defendant was interviewed by two professionals. The defendant expressed a dislike for the first person selected, and the defendant's decision not to call that person as a witness was honored. At some point just before trial, the defendant insisted on presenting a defense

---

[20]As indicated in his affidavit filed in connection with the motion for a new trial, the attorney preferred the latter defense because he believed that the identification evidence was very strong and that the mental impairment defense might negate the element of deliberate premeditation necessary for a conviction of murder in the first degree.

[21]The defendant also raises this issue as a separate ground of appeal.

based solely on identity. He rejected a mental impairment defense and signed a letter to that effect on July 16, 1992. However, the defendant then agreed to be interviewed by Dr. Stuart Carter, and was examined by Dr. Carter on or about July 17, 1992, three days before trial began. The defendant and his counsel discussed using Dr. Carter's testimony together with the identification defense. The defendant specifically queried trial counsel regarding the possibility that the jury might consider the mental impairment defense to negate the primary defense of misidentification and result in their concluding that he was the shooter. The attorney agreed that this was probable, but that the strength of the Commonwealth's identification evidence would yield that result in any case, and that the defense of mental impairment provided the only real possibility of avoiding a verdict of murder in the first degree.

In accord with this belief, the defendant and his counsel agreed that the mental impairment defense would not be presented until after the Commonwealth rested and they could evaluate the Commonwealth's case. Consistent with this plan, defense counsel cross-examined the Commonwealth's identification witnesses, attempting to discredit them, and only after the Commonwealth rested did defense counsel present the mental impairment defense. As the defendant's affidavit virtually concedes, defense counsel made this decision with the consent of his client and with the client's awareness of the potential problems.[22] Although appellate counsel argues that the defendant's consent was vitiated because trial counsel did not explain the "risks" of the type of mental impairment defense utilized here, we do not engage in dissecting the exact words counsel must use in discussions with his client.

In regard to the dual defense strategy, the defendant next claims that counsel omitted from his opening statement any

[22]"After the Commonwealth rested, [trial counsel] discussed with me putting on [the expert witness]. [Counsel] said that, in his opinion, we needed [the expert's] opinion as evidence on the issue of intent, in case the jury believed that I was the shooter. I relied on his opinion and agreed that [the expert witness] could testify. . . . I understood that the 'mental' defense would be a 'back-up' which might give me protection from a first-degree murder verdict in case the jury believed the people who identified me as the shooter."

discussion of the evidence supporting the defendant's chosen defense, misidentification. Rather, in his opening, made after the Commonwealth rested, defense counsel focused on the expected expert testimony concerning mental impairment. The opening statement is "to outline in a general way the nature of the case which counsel expects to . . . prove." *Commonwealth* v. *Degro*, 432 Mass. 319, 322 (2000), quoting *Commonwealth* v. *Hoilett*, 430 Mass. 369, 372 (1999). The nature of the case trial counsel intended to prove concerned the defense of mental impairment. Defense counsel previously had attacked the identification evidence by means of cross-examination of the Commonwealth's witnesses during the Commonwealth's presentation of evidence.

Appellate counsel criticizes trial counsel's description of the defendant in his opening as "antisocial . . . [with] impulsive action or reaction to almost little or no provocation, and also typified by a lack of remorse, misconduct." But these words mirrored the evidence that was in fact presented by the expert. In the hope of obtaining a verdict less than murder in the first degree, the strategy was to convince the jury that the defendant could not premeditate, that he was compelled by intoxication and other forces in his personality to perpetrate a horrific crime based on a total absence of reason. Defense counsel thus was justified in proceeding as he did. Defense counsel's conduct was not "tantamount to an admission of his client's guilt" or an "abdicat[ion of] his client's position." *Commonwealth* v. *Triplett*, 398 Mass. 561, 569 (1986), quoting *People* v. *Carter*, 41 Ill. App. 3d 425, 429 (1976). Counsel took pains to avoid the suggestion that presentation of evidence concerning the defendant's personality meant that the defendant had committed these crimes. Rather, he emphasized that the expert's testimony was not intended to suggest that the defendant had done "anything in this case." It was presented to indicate the effect of the defendant's mental impairment on the issue of his intent only "if you find it necessary to consider what his intent was at any given point in time in this case," i.e., only in the event the jury were to find that the defendant was the shooter. Trial counsel told the jury that they could only consider the

defendant's intent if they first concluded beyond a reasonable doubt that "he did these things."[23]

The defendant next contends that his trial counsel was ineffective for omitting from his closing argument any discussion of the evidence supporting the attorney's preferred defense, mental impairment. This tactic was not inconsistent with the chosen strategy: primary focus on the attempt to undermine the strength of the Commonwealth's identification witnesses, and should the misidentification defense be rejected, evidence of mental impairment as a secondary defense.[24] This was a continuation of the agreed strategy.

The defendant's final contention in regard to the dual defense strategy is that it resulted in the prosecutor's relying during closing argument for substantive purposes on statements made by the defendant to the defense expert. These statements were elicited on cross-examination of the expert.[25] The judge had earlier instructed the jury that the medical history of the defendant was not offered for "consideration on the guilt or innocence of the defendant." When the prosecutor referred to

---

[23]Our reading of the transcript causes us to reject the defense suggestion that the expert's reference to "this particular case," meaning "the case of Curtis Johnson," means that the defendant must have described what he had done in this case to the doctor. "In the case of Curtis Johnson," seems to us to mean in regard to the person, Curtis Johnson.

[24]To the extent that trial counsel minimized the secondary defense, this may have resulted from an assessment that the expert testimony had not been well received by the jury. The fact that an attempted defense does not work out as well as planned or hoped does not transform the strategy into a manifestly unreasonable one. "In cases where tactical or strategic decisions . . . are at issue, we conduct our review with some deference to avoid characterizing as unreasonable a defense that was merely unsuccessful." *Commonwealth* v. *White*, 409 Mass. 266, 272 (1991).

[25]The defense expert testified that the defendant had expressed resentment of authority by saying, "They don't f—— with me, I don't f—— with them," and agreed that the defendant had said that he "felt more in control when he had been drinking."

The prosecutor argued: "You heard one other thing brought out by the [defense expert] yesterday. And consider this when you are considering the actions of [the defendant]. [The defendant] told that psychologist that he felt he was in control when he drank. And I'd suggest on this particular evening on September 28th that he felt he was in control. That since these people . . . had f——d with him, he was going to f—— with them, and he did, and he shot them outside. For these reasons . . . for the facts that are before you, we ask you to find [the defendant] guilty of all of the indictments."

these statements in closing argument, the defendant objected. In response, the judge instructed during his charge that the evidence from the defense expert could only be used for the jury's consideration as to the defendant's mental impairment or mental condition.

The propriety of the judge's ruling limiting the testimony of the psychologist is not at issue. The ruling had been made during trial, and counsel were bound by it. The prosecutor in closing repeated the words that were in fact in evidence, albeit for a limited purpose. His language was consistent with proper use of the evidence for the limited purpose for which it was admitted.

(c) *Voir dire testimony.* The defendant maintains that his counsel was ineffective because he adopted a "manifestly unreasonable strategy" concerning damaging hearsay testimony of the witness, Jannie Bynum. We summarize the pertinent events relative to this witness. Prior to trial, Bynum said that the defendant made two statements about the shooting to her. She told the Worcester police that, after the defendant returned from the Ding Ho restaurant on the night of the murder, he said to her, "I did something bad . . . ." In a statement to the police under the pains and penalties of perjury,[26] Ms. Bynum also said that the defendant had admitted to her just after the incident that he had shot two people.[27] She testified to the "I shot two people" statement under oath to the grand jury. Shortly before trial, however, she informed the prosecutor that the defendant had not actually said that he had shot two people. Rather, she said that this was her inference from their conversation.[28] Trial counsel stated in his affidavit that he had learned before trial that Bynum "had given indication that some of her testimony might change," and he was aware that the Commonwealth wished to introduce Bynum's earlier statements as admissions by the defendant.

Bynum was also an important witness for the defense. She

---

[26]There is no explanation in the record why Ms. Bynum provided the police with a statement under the pains and penalties of perjury.

[27]In her statement to the police she further stated that the defendant told her that "he spat in the man's face." At the voir dire, Bynum said she recalled telling that to the police.

[28]She never repudiated the defendant's statement that "I did something bad . . . ."

had strong evidence regarding the level of the defendant's intoxication on the night of the incident, specifically, that his speech was incoherent and he was obviously drunk prior to the incident at the Ding Ho restaurant. (She also testified that the defendant was drinking beer when he madè the second statement to her.)

Defense counsel sought and obtained a voir dire of this witness on the issue of the voluntariness of the defendant's statements to her, given his intoxicated state at the time of both statements. According to defense counsel's affidavit, his strategy was to prevent these damaging admissions of the defendant from being presented to the jury (on the ground that the defendant's intoxication precluded their voluntariness).

At the voir dire, Bynum repudiated her original statement that the defendant had said, "I shot two people." This repudiation raised issues as to the Fifth Amendment to the United States Constitution because she had previously provided contrary testimony under oath to the grand jury, and, after counsel was appointed for Bynum, she claimed her Fifth Amendment privilege. The judge then ruled her unavailable because of her claim of privilege and admitted only the defendant's first statement: "I done something bad . . . ."

The defendant contends that trial counsel should not have requested a voir dire of Bynum, but should have raised the issue of her possible perjury and Fifth Amendment privilege at the outset of trial. If this had been done, counsel would have been appointed, advised Bynum not to testify, and her testimony would not have been presented to the jury at all.

The motion judge concluded that counsel's strategy was not manifestly unreasonable. We agree. When the arguably reasoned tactical or strategic judgments of a lawyer are questioned, we do not "second guess competent lawyers working hard for defendants who turn on them when the jury happen to find their clients guilty." *Commonwealth* v. *Stone*, 366 Mass. 506, 517 (1974). "The test is not to be made with the advantage of hindsight, and any violation of the attorney's duty must be both substantial and prejudicial." *Commonwealth* v. *Adams*, 374 Mass. 722, 729 (1978). "Trial tactics which may appear questionable from the vantage point of hindsight, do not amount

to ineffective assistance unless 'manifestly unreasonable' when undertaken." *Commonwealth* v. *Haley*, 413 Mass. 770, 777-778 (1992).

The decision to attempt to suppress the defendant's statements to Bynum due to the defendant's intoxicated condition was not "manifestly unreasonable." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). Of course, a hearing was necessary to obtain such a ruling, and, in fact, trial counsel's strategy of limiting the introduction of the defendant's statements to Bynum was, as the judge concluded, "largely successful." Counsel prevented the most damaging admission, "I shot two people," from being presented to the jury. Further, counsel stated in his affidavit that he was unsure what the witness might say at any point. The voir dire, thus, also provided him an opportunity to learn the content of Bynum's trial testimony, if admitted, and forced her to contradict herself (if she were to do so) under oath.

The decision to request voir dire was also made in the context of the likely admission of Bynum's grand jury testimony regarding the same damaging statements pursuant to the rule adopted in *Commonwealth* v. *Daye*, 393 Mass. 55, 75 (1984) ("prior inconsistent statement is admissible as probative if made under oath before a grand jury, provided the witness can be effectively cross-examined as to the accuracy of the statement, the statement was not coerced and was more than a mere confirmation or denial of an allegation by the interrogator, and other evidence tending to prove issue is presented"). Indeed, at one point, the judge considered that Bynum's grand jury testimony might be admissible under the *Daye* rule. Bynum's grand jury testimony was ultimately ruled inadmissible, but only after a lengthy hearing on the issue (after the voir dire) and only on the ground that her testimony did not meet the requirement that it must be more than mere confirmation or denial of allegations by the interrogator.

4. *Admission of Prior Recorded Testimony.* The defendant argues that the admission of Bynum's prior recorded testimony (the defendant's "I did something bad" statement to her which she had repeated during the voir dire) violated his right to confront the witnesses against him, as guaranteed by the Sixth

Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.

Prior recorded testimony is admissible "in a proceeding addressed to substantially the same issues as in the current proceeding, with reasonable opportunity and similar motivation on the prior occasion for cross-examination of the declarant by the party against whom the testimony is now being offered." *Commonwealth* v. *Trigones*, 397 Mass. 633, 638 (1986), quoting *Commonwealth* v. *Meech*, 380 Mass. 490, 494 (1980). The defendant contends that counsel's motivation in cross-examining Bynum at the voir dire was not "addressed to substantially the same issues" for which the Commonwealth introduced her testimony at trial. We disagree.

Counsel's purpose in cross-examining Bynum at the voir dire was not only to contest the voluntariness of the statements, but also to establish Bynum's repudiation of her earlier testimony regarding one of the statements. His questions were directed to both those purposes. The issue at trial was whether Bynum was truthfully testifying about the statements. In both instances, cross-examination considered a similar issue: whether the defendant made the statements at all in view of the witness's recantation of her earlier testimony on the subject. Counsel's motivation for cross-examining Bynum at the voir dire thus was addressed in at least one respect to the same issue as at trial: whether the defendant in fact made the statements. The testimony was properly admitted. Cf. *Commonwealth* v. *Meech*, *supra* at 494-496 (no substantial sameness of issues when Commonwealth questioned witness at grand jury to inquire about defendant's possession of murder weapon and issue at trial was defendant's criminal responsibility).

5. *Conclusion.* The judgment of conviction on the indictment charging murder in the first degree is reversed (no. 91-02611), the verdict is set aside, and the case is remanded for a new trial. The judgments of conviction on the remaining indictments are affirmed, and, to the extent that the defendant's motion for a new trial raises issues other than those concerning the first degree murder conviction, the denial of the motion for a new trial is also affirmed.

*So ordered.*