HENRY C. SMITH *vs.* FIRST NATIONAL BANK IN WESTFIELD.

A verdict for a party bound by the nature of his action to maintain one proposition against another is necessarily wrong, if all the evidence on which it is rendered tends equally to support either proposition.

An action against a bank for the conversion or the loss by gross negligence of valuable articles deposited with it as a bailee without hire cannot be sustained on evidence from which the inference that the articles were stolen by servants of the bank, selected and continued in its employment without negligence, who in the proper course of business had access to them, is equally deducible with any other inference.

It is not negligence for a bank to intrust its cashier to select and hire and pay out of his salary all the clerks and other servants employed in the banking room; no negligence being shown in the selection of the cashier.

No exception lies to the refusal of the judge presiding at a trial to rule on the sufficiency of the evidence to sustain the action before testimony is closed on both sides.

TORT to recover the value of bonds of the United States for the payment in all of $1000, deposited with the defendants for safe keeping, and alleged in one count to have been lost through their negligence, and in another count to have been converted by them to their own use.

At the trial in the superior court, before *Brigham*, J., the plaintiff's evidence tended to show that the facts were substantially as follows : The defendants were an incorporated bank, having a banking room in Westfield, divided into two portions by a counter and a partition resting upon it, through an aperture in which partition the officers and clerks of the bank transacted business with its customers. The defendants' cashier was Henry Hooker, to whom they paid, as a salary, a sum out of which he paid the clerks and servants employed in the banking room, all of whom were hired by him. Prior to November 16, 1865, the plaintiff had United States bonds, to the amount of $300, inclosed in an unsealed envelope, which was deposited for safe keeping in a safe, called burglar-proof, in the defendants' vault in their banking room, and was kept on a shelf with from thirty to fifty similar envelopes, (some sealed, and others not so,) having similar contents. On that date an additional bond, for $500, bought by the defendants' cashier for the plaintiff at the plaintiff's request, was put by the cashier into the envelope, by the

plaintiff's direction. In January 1866 the envelope containing all these bonds was produced, at the bank, by the request of the plaintiff, and coupons were cut from them. In February 1866 the plaintiff " procured at the defendants' said office, of a person acting as clerk of the defendants, two additional United States bonds, each for $100, which, by the plaintiff's direction, were deposited in said envelope with the other United States bonds described, said envelope having indorsed upon it the plaintiff's name, and figures or letters indicating its contents." " In May 1866 the plaintiff, accompanied by his brother, at the defendants' banking office aforesaid, asked of a person acting as clerk of the defendants for the envelope containing his United States bonds, for the purpose of taking coupons attached thereto, and thereupon said person brought out to the counter all the envelopes containing United States bonds which were kept as described in the defendants' vault, and searched among them for the plaintiff's envelope, but failed to find it, and so told the plaintiff;" and the plaintiff " never has discovered or obtained possession of said missing envelope or bonds."

Several months before May 1866 the number of envelopes, containing bonds, in the defendants' charge, had so increased that they procured a box to hold them; after which, the envelopes, instead of being laid loosely on the shelf in the safe, were kept in the box, which was placed on the shelf. Whenever any of the owners of the envelopes had occasion to inspect or use his property, all the envelopes together were brought out from the safe by the cashier or some one of his clerks, (in the box, after a box was procured,) and laid on the counter, at the left of the aperture, and not within reach of any person outside of the partition, and there were examined to find his particular envelope. (This was the course pursued on several occasions, in the instance of the plaintiff, between the time of his first deposit of bonds and the time of the discovery of the loss; and one of the defendants' former clerks, who left their service early in March 1866, after testifying to his knowledge of the plaintiff's having bonds to the amount of $1000 in the envelope before that time testified further, on cross-examination, " that upon one or two

occasions he brought out and delivered to the plaintiff, at his request, his package, but did not know what was put back in the package when the plaintiff examined it, and did not of his own knowledge know that there was any bond in it; that for aught he knew the plaintiff might have taken them out.") After the applicant had finished his examination or other use of his envelope and its contents, and restored it to the clerk, it, with the other envelopes, was usually then put back into the safe; but sometimes the envelopes were suffered to lie some little while before being put back, while entries were made on a book which lay upon the counter on the right of the aperture.

After the clerk had failed to find the plaintiff's envelope and bonds in May 1866, as above described, the plaintiff asked the cashier what was the meaning of their disappearance; and he, after fruitlessly searching for them in the vault, told the plaintiff that he thought they were mislaid, and asked the plaintiff to call the next day, and the next day informed the plaintiff that he had searched, with his wife, in the banking room, vault and safe, for the missing property, until midnight, but had not found it.    Afterwards the plaintiff had an interview with the cashier and with the president of the bank, William G. Bates, at the office of the latter, where, in answer to an inquiry, the cashier said "that the plaintiff's envelope and bonds might have accidentally got into the waste basket, kept in the banking room, and have been burned with the waste paper deposited in said basket;" and thereupon "said Bates tapped on the floor with his foot, and said cashier stopped any further explanation. At the same interview, the cashier, when asked whether the envelope and bonds might not have been stolen, replied that he had perfect confidence in both of the boys employed in the banking room."

No evidence was offered by the plaintiff of any hire or consideration for the keeping of his bonds by the defendants, "unless such as might be justly inferred from his purchase of said bonds of the defendants, or in their banking office of said Hooker, or of persons there acting as the defendants' clerks."

The plaintiff also testified that he never requested letters to

be written to Washington by the defendants' officers in relation to his lost bonds, nor ever asked if letters had been received from Washington in relation to them, or saw or read or heard the contents of any such letters.

When the plaintiff rested his case, the defendants asked the judge to rule that upon the facts in evidence the action could not be maintained. The judge declined to rule upon the legal effect of said facts, unless the defendants rested also upon those facts; but the defendants declined to rest their case without introducing further evidence.

The defendants then introduced evidence which tended to modify the plaintiff's evidence in the following particulars : That the cashier was suffered by the defendants to trade in United States bonds in their banking room on his private account; and of the bonds in the plaintiff's envelope all but the two for $100 each were sold by the cashier individually to the plaintiff, or procured by him individually for the plaintiff; but that those two he sold to the plaintiff out of a lot of $10,000 which belonged to the defendants and which he was authorized to sell in their behalf. That all the defendants' money was kept in the safe, except during business hours when it was kept on the counter or in drawers within the counter; that trunks and large packages, containing articles of value to a great amount, were kept in the vault outside of the safe ; that the safe "had the most secure lock the defendants could procure," and the key was kept by the cashier; that only one of the defendants' directors entered the vault, and he only when left in charge of the business of the bank during the absence of the cashier; that the cashier "told the plaintiff, when he took the plaintiff's envelope, that it was taken at the plaintiff's risk;" and that the plaintiff saw and knew where and how his envelope and its contents were kept in the safe, and where and how they were placed and cared for when taken from the safe to the counter for any purpose of his own or of any owner of any of the other envelopes. That the place on the counter where the envelopes were laid when taken from the safe for examination was three or four feet to the left of the aperture in the partition

" That the waste papers of the defendants were kept in a basket under the counter, at the feet of the defendant's teller or clerks as they stood usually, inside of the counter, in front of said aperture, and said waste basket was so placed under the money drawer, and with a shelf between it and the place where envelopes containing United States bonds were laid when taken from the safe temporarily, that any of said envelopes falling from said counter could not fall into said waste basket;" "that the contents of the waste basket, when not wanted for fuel, were put in a box in the cellar, and, before they were burned or put in said box, were carefully examined, one by one, to see if anything of value was among them ; and that the cashier examined the waste papers of the defendants in the box in the cellar within two or three weeks after the discovery of the loss of the plaintiff's bonds." That the cashier, on one or two occasions, at the plaintiff's request, brought out and delivered to the plaintiff his envelope, and on these occasions did not examine it when he delivered it to the plaintiff nor when the plaintiff returned it. That a bond, of the same denomination and number as one of the two $100 bonds which the plaintiff bought in February 1866, had, since the date of the loss of the plaintiff's envelope and bonds, been deposited with the defendants by one Foster, a clergyman in Wilbraham, who did not buy it from the defendants. And finally that, at the interview in Bates's office, Bates did not interrupt any explanation of the cashier to the plaintiff, by tapping on the floor or by any other sign.

For the purpose of contradicting the plaintiff's testimony about letters to and from Washington concerning his bonds, and also to show that his bonds were not lost by means of the waste basket, but were stolen, the defendants further offered in evidence some letters purporting to be addressed to the cashier and to a member of congress, by officers of the treasury department of the government of the United States, which had relation to the lost bonds ; and at the same time offered to show that these letters were either exhibited or read to the plaintiff; but the judge refused to admit them.

" When the evidence of the foregoing facts, on the part of the

plaintiff and defendants, was in, (constituting all the evidence relied upon by either party at the trial,) the defendants requested the judge to rule that upon all the evidence the plaintiff could not maintain his action ; but the judge refused so to rule.

" The defendants then requested him to rule that the fact that a waste basket was kept by them, into which the package of the plaintiff might have possibly fallen or been accidentally thrown, was not evidence of gross negligence, and would not render the defendants liable, provided the waste basket was kept by the defendants where their business required it to be kept, and its contents were examined with ordinary care when it was emptied.

" The judge refused to rule as thus requested, and submitted the case to the jury upon the following instructions : The defendants, having received and kept the property of the plaintiff exclusively for his benefit and without hire, are not responsible for its loss or destruction, unless caused by the gross carelessness or gross negligence of the defendant corporation or of its officers and servants ; and with such officers and servants would be included the president, directors, cashier, and all the clerks employed in the bank, its vaults and safe, notwithstanding such clerks were employed and compensated by the cashier, out of his salary and on his personal account, as his assistants. There would be a loss by gross carelessness, for which the defendants would be responsible, if the plaintiff's property, while kept by and deposited with the defendants, was by gross carelessness of them or their officers or servants, mingled with property of the defendants or other persons, similar in appearance and character to the plaintiff's property, and disposed of by the defendants as their property, or delivered to such other persons as their property ; also if, by gross carelessness of the defendants' officers and servants, the plaintiff's property was placed or suffered to be mingled with waste paper of the defendants, and with such waste paper was disposed of or destroyed as waste paper by the defendants or their servants ; also if, by gross carelessness of the defendants, their officers or servants, the plaintiff's property was so exposed that persons not in the service of the defendants could and did steal it. But if the plaintiff's property, not hav-

ing been deposited, kept or exposed with gross carelessness, was stolen by the defendants' officers or servants, employed in or about their bank, vault or safe, who availed themselves of the opportunities afforded them of access to the bank, vault and safe, by their employment and service, to steal said property, the defendants would not be responsible for the loss by such theft."

The jury found for the plaintiff; and the defendants alleged exceptions.

*W. G. Bates & M. B. Whitney,* for the defendants.

*H. Morris & N. T. Leonard,* for the plaintiff.

WELLS, J.   This was a gratuitous bailment.   The defend· ants are liable only for want of ordinary care.   Upon the facts which appear, mere failure to return the bonds upon demand would not constitute a conversion.   The loss of the bonds is sufficient reason for not returning them, unless the loss occurred by the fault of the defendants.   The action is in tort, and the burden is upon the plaintiff throughout.   In order to charge the defendants with the loss, he must show gross carelessness on the part of the bank in some respect affecting the safe custody of the bonds, or which occasioned their loss.

As the case stands, the evidence furnishes no proof of negli· gence, except that which results by inference from the fact of loss.   But theft, by either of the several persons who had access to the vault and to the packages, is equally open to inference from the same facts.   For a loss in that mode, it is settled that the bank would not be responsible.   *Foster* v. *Essex Bank,* 17 Mass. 479.   The evidence went far to show that the bank did use due care in all its arrangements for the safety of the securi· ties deposited.   They were kept in the same vault and safe with the securities of the bank, and the same persons had access to both.   There was no evidence of negligence in the selection of cashier or his clerks, or in permitting them to be retained after notice of unfitness.   On the other hand, the plaintiff's evidence entirely failed to exclude the possibility of loss by other means than negligence of the defendants.   It left the case, therefore, to be decided by mere inference, without any facts to determine which of several inferences was correct.   The presumption of

innocence would be sufficient to protect the cashier and his clerks from the charge of theft; but that presumption will not avail to sustain the burden of proof in an action against the bank for negligence.

There being several inferences deducible from the facts which appear, and equally consistent with all those facts, the plaintiff has not maintained the proposition upon which alone he would be entitled to recover. There is strictly no evidence to warrant a jury in finding that the loss was occasioned by negligence and not by theft. When the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof. A verdict in favor of the party bound to maintain one of those propositions against the other is necessarily wrong.

We can see no objection to the instructions which were given to the jury ; or to the rulings in the trial of the case. The court could not be required to take the case from the jury at the close of the testimony for the plaintiff. *Wetherbee* v. *Potter, ante,* 359, 360, and cases there cited. The letters offered and excluded were not competent as affirmative proof upon the question of the mode of loss of the bonds; and they did not tend to contradict the plaintiff in either of the particulars stated in the offer. We do not think the court was bound to give instructions in regard to the waste-paper basket, with the minute particularity of the defendants' prayer. The instructions given were sufficient.

But the court are of opinion that the whole testimony did not furnish such evidence as would warrant a jury in finding that there was gross negligence on the part of the bank, and that the loss of the bonds resulted from such negligence. *Giblin* v. *McMullen,* Law Rep. 2 P. C. 317. The exceptions must therefore be sustained upon that ground, and a

*New trial granted.*