COMMONWEALTH *vs.* WILLIAM RAGLAND
(and a companion case[1]).

No. 06-P-1199.

Suffolk. November 8, 2007. - October 14, 2008.

Present: BERRY, MEADE, & SIKORA, JJ.

*Evidence,* Testimony before grand jury, Prior inconsistent statement, Corroborative evidence, Identification. *Grand Jury. Practice, Criminal,* Grand jury proceedings, Argument by prosecutor, Jury and jurors, Question by jury, Instructions to jury. *Jury and Jurors.*

Discussion of the foundational requirements for the admissibility, as substantive evidence, of a witness's prior grand jury statements that are inconsistent with that witness's trial testimony. [822-824]

At the trial of an indictment charging assault and battery by means of a dangerous weapon, where an eyewitness to the incident recanted her grand jury statements concerning the defendant's possession of a knife, sufficient corroborating evidence existed to permit the admission of prior grand jury statements, namely, a police detective's testimony recounting that eyewitness's statement in an interview regarding the defendant's use of a knife in the assault [824-827]; that eyewitness's out-of-court identification of the defendant's photograph, as well as information that the person depicted had possessed a knife and had stabbed the victim [827-829]; another eyewitness's testimony that she had observed blood on the defendant's hands that he immediately washed away following the attack [829-831]; and the victim's out-of-court identification of the defendant as one of his attackers [831].

Viewed in totality, the evidence at a criminal trial was sufficient to convict the defendant of assault and battery by means of a dangerous weapon, where witnesses identified him as the individual who had held a knife, stabbed the victim, and had blood on his hands that he immediately washed away following the attack, and where assessing the credibility of witnesses was the exclusive province of the jury. [831-833]

There was no merit to a criminal defendant's contention that a witness's grand jury testimony, which she repudiated at trial, sustained an equally and inconsistent exculpatory version of the offense, where the witness's testimony confirmed that the defendant perpetuated an assault and battery during the attack on the victim. [833-835]

Even assuming that an ambiguity in the prosecutor's closing argument at a criminal trial suggested that a witness recanted her grand jury testimony

---

[1]Commonwealth *vs.* Trevor Watson.

because she was afraid of the defendants, such error would not warrant reversal of the defendants' convictions, where any such statement was not overt, where the jury could see the witness and assess her explanation for the recantation, where the judge carefully instructed the jury that closing arguments were not evidence, and where the verdicts evinced jury sophistication in sorting out prosecutorial comments. [835-836]

The judge at a criminal trial properly exercised his discretion in answering a jury question regarding a collateral matter — the consequences for a potential perjury charge against a witness — by stating that the jury should not concern themselves with that matter, where there was no suggestion by any party that such charges were being contemplated. [836-838]

INDICTMENTS found and returned in the Superior Court Department on November 14, 2000.

The cases were tried before *Charles T. Spurlock*, J.

*Elizabeth Caddick* for William Ragland.

*Kathleen M. Kelly* for Trevor Watson.

*Macy Lee*, Assistant District Attorney, for the Commonwealth.

BERRY, J. In this appeal, we address the evidentiary standards that govern the admission of grand jury statements when the witness recants the statements during trial and then gives inconsistent testimony, in circumstances where the recanted grand jury statements constitute the proof of an essential element of the offense — here, the element of possession of a knife in the offense of assault and battery by means of a dangerous weapon. We further address what trial evidence will serve to provide the necessary corroboration for the recanted and inconsistent grand jury testimony. See *Commonwealth* v. *Clements*, 436 Mass. 190, 192-193 (2002). See also *Commonwealth* v. *Sineiro*, 432 Mass. 735, 741-742 (2000); *Commonwealth* v. *Cong Duc Le*, 444 Mass. 431, 432, 435-442 (2005); *Commonwealth* v. *Figueroa*, 451 Mass. 566, 573-577 (2008). In addition, see Proposed Mass.R.Evid. 801(d)(1)(A), concerning prior inconsistent statements given under oath, and Proposed Mass.R.Evid. 801(d)(1)(C), concerning the admission of out-of-court identification evidence as substantive evidence.[2]

The conviction of defendant Ragland of assault and battery

---

[2]Proposed Mass.R.Evid. 801(d)(1)(A) and 801(d)(1)(C) provide as follows.

"(d) Statements which are not hearsay. A statement is not hearsay, if —

by means of a dangerous weapon, a knife (ABDW),[3] and the conviction of defendant Watson of assault and battery result from an attack upon, and the stabbing of, a man in a Boston after hours night club.[4] The principal appellate challenge to the convictions pressed by both defendants is that there was insufficient evidence, in that central to the Commonwealth's trial proof was the introduction of highly incriminatory grand jury testimony which was recanted by the principal prosecution witness at trial. Specifically, the witness's trial testimony was inconsistent both with her statements in police interviews and with her testimony before the grand jury concerning the acts by, and the role in the assault by, the respective defendants. Accordingly, the witness was impeached with her differing statements to police detectives. Beyond that, the witness's prior inconsistent grand jury testimony, given under oath, was admitted as substantive evidence to prove the defendants' guilt.

In this appeal, the defendant Ragland argues that the recanted grand jury testimony — which was the only substantive evidence placing a knife in his possession — was not sufficiently corroborated and, therefore, that the recanted grand jury testimony cannot be deemed sufficient evidence to support his conviction of ABDW. The defendant Watson advances a variant of this challenge and asserts that because the principal prosecution witness at trial retracted her grand jury testimony, the evidence was divided between two equally inconsistent propositions as to whether the defendant Watson committed an assault and battery and that, therefore, his conviction cannot be upheld.

The defendants advance two additional appellate challenges: (a) that the prosecutor's closing argument was improper because

---

"(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding [i.e., here, the grand jury], or in a deposition . . . or (C) one of identification of a person after perceiving him . . . ."

[3]The defendant Ragland was also convicted of assault and battery. That indictment was placed on file with the defendant's consent.

[4]The defendant Ragland was acquitted of assault with intent to murder and of assault and battery by means of a dangerous weapon, a shod foot. The defendant Watson was acquitted of assault with intent to murder and of assault and battery by means of a dangerous weapon.

of what the defendants characterize as suggestive remarks in the closing that the recantation at trial was caused by the witness being in fear of the defendants; and (b) that the judge wrongfully refused to answer the jury's question regarding the penalty for perjury. For the reasons stated herein, we affirm.

*Background of the events at the Buzz Club.* The trial evidence provided the following backdrop within which the events leading to the convictions unfolded. In the late evening of September 24, 2000, continuing to the early morning of September 25, a crowd of about 300 men and women gathered at the Buzz Club in Boston for dancing and drinking at an after hours party. Paul Pierce — the victim of the stabbing attack — and two of his friends, Derrick and Tony Battie (the Batties), arrived at the club shortly before 1:00 A.M. At one point during the party Pierce was talking to two women, Delmy Suarez and Keisha Lewis. The defendant Ragland, who is Lewis's cousin, was standing nearby. Words were exchanged between the defendant and Pierce. A fight erupted. Other individuals, estimated by witnesses to be eight in number — and one of whom was identified as the defendant Watson — joined Ragland in what escalated to a full-scale attack on Pierce. The attack was vicious and sustained. Pierce described punches landing all over his body, a hit to his head with a bottle, and stinging, piercing thrusts to his abdomen and back, which left several deep stab wounds.

All the attackers fled. In the immediate aftermath, no person present in the club that night came forward with identifying information concerning the individuals involved in the attack. However, the Boston police began to develop a list of suspects from information received suggesting that a certain group of individuals described at trial as having a "common social thread"[5] might have been involved in the assault. Ultimately the investigation came to focus on, among others, the defendants, leading to the return of grand jury indictments.[6]

As previously noted, the defendants' principal appellate chal-

---

[5]The phrase "common social thread" was, in effect, a euphemism used to avoid any potentially prejudicial effects which might flow from information developed during the investigation that the defendants were affiliated with a group known as the "Made Men."

[6]The defendants were tried with a third defendant, who was acquitted of all charges.

lenge relates to the introduction of recanted grand jury testimony of one Krystal Bostick, a major witness in the Commonwealth's direct case. The thrust of the appellate challenge concerns whether essential parts of Bostick's recanted and inconsistent statements to the grand jury, which were admitted as substantive evidence during her appearance as a witness at trial, were adequately corroborated by other trial evidence. This challenge, in turn, is intertwined with an over-all challenge to the sufficiency of the evidence to support the defendants' convictions. Given the nature of the appellate challenge leveled by each of the two defendants, it is necessary to summarize the trial evidence in some detail. We first address, in part 1, the case presented by the Commonwealth involving the defendant Ragland, and then, in part 2, we address the case presented by the Commonwealth involving the defendant Watson. Lastly, in part 3, we address the defendants' other appellate claims.

1. *The defendant Ragland.* While a number of witnesses identified the defendant Ragland as a lead participant in the attack upon the victim Pierce, Bostick was the only witness who placed a knife in his hand and described his repeated stabbing of Pierce.

We begin in part 1.a by setting forth the conflicts and inconsistences in the various statements and sworn grand jury testimony of Bostick as to what she witnessed concerning the defendant Ragland's acts during the attack on the victim Pierce at the Buzz Club; we next set forth in part 1.b the governing legal principles in our jurisprudence for the substantive admission of prior inconsistent grand jury testimony, such as Bostick's (an analysis applicable to both defendants); we then address in part 1.c, including subparts 1.c.i-iv, the corroboration in the trial evidence for Bostick's grand jury references concerning Ragland's possessing a knife and stabbing of the victim; and lastly, we review the full compilation of trial evidence to determine the sufficiency of the probative evidence with respect to the offense element that the defendant Ragland committed an assault and battery upon Pierce by means of a dangerous weapon, a knife.

a. *The witness Bostick's conflicting trial testimony, prior statements, and grand jury testimony concerning the defendant Ragland.* About thirty-two hours after the events at the Buzz Club, Boston police Detective Barnicle received a telephone

call from a Rhode Island police officer. That officer informed Barnicle that he had interviewed a student at a local college, Krystal Bostick, who stated that she had been at the Buzz Club and had witnessed the attack. Bostick had stated that a man known to her as "Roscoe" or "Rocco" (hereinafter "Roscoe") was a participant in the attack.

On September 26, 2000, Detectives Barnicle and Chin met Bostick at the Providence police headquarters. Bostick told the detectives that she had seen Roscoe stab the victim in the chest with a knife. Bostick drew a picture of the serrated-edge knife that Roscoe had wielded. The detectives displayed two separate photographic arrays, which had been compiled from information developed in the investigation to date. In one of the arrays, Bostick identified a photograph of the defendant Ragland as the man known to her as Roscoe. Bostick circled the photograph, and signed and dated it. (We reserve and later set forth in part 1.c.ii the fuller detail of this out-of-court identification of the defendant Ragland as having and using a knife in the attack — all as described at trial by Detective Barnicle.)

In her appearance before the grand jury Bostick also gave highly incriminatory evidence against the defendant Ragland, identifying this defendant as initiating the attack, holding a knife with a serrated edge, and repeatedly stabbing the victim Pierce. (We set forth below and in the Appendix a series of direct quotations from Bostick's grand jury testimony as those parts were read into the record at trial by the prosecutor to be considered by the jury as substantive evidence.)

When called to the stand to testify at trial, Bostick was a recalcitrant witness,[7] who, in a continuing pattern of non-responses to the prosecutor's questions, gave serial answers that she did

---

[7]When first called to the witness stand on the fifth day of trial, Bostick refused to testify, invoking Federal and State constitutional privileges against self-incrimination. The judge admonished Bostick, noting that in a pretrial hearing, when Bostick had indicated that she might refuse to testify, the judge had ruled that Bostick did not have such privileges because nothing she said was incriminating to her. When Bostick continued to refuse to answer the prosecutor's questions, the trial judge found her in contempt, imposed a three-month sentence of incarceration, but then stayed the sentence for a time. Bostick returned to the witness stand the next day, the sixth day of the trial. In this second appearance, while not outrightly refusing to answer, she nonetheless presented the persona of one who could remember virtually nothing, gave

not remember things when the Buzz Club events occurred — indeed, at one point, Bostick professed to having no memory of where she was on the evening of September 24 and 25, 2000. Then, as she was pressed in further interrogation by the prosecutor, Bostick began to give laconic answers, denying that she had seen certain acts by Ragland and testifying in a manner diametrically different from, and in conflict with, her prior descriptions and the statements she had given concerning what she had seen happen at the Buzz Club. At trial, Bostick's short negatives recanted critical parts of her testimony before the grand jury. Specifically, at the trial, directly at odds with her grand jury testimony, Bostick stated that she "really didn't focus in on Roscoe" (as previously noted, Bostick knew the defendant Ragland by this name), "did not see [Roscoe] with [a knife]," and "didn't see him do anything" in the manner of stabbing thrusts to Pierce's body.

Bostick's trial testimony was limited to an acknowledgment that the defendant Ragland was present at the club and that Bostick saw Pierce speak to a young woman, at which point the defendant Ragland approached Pierce, whereupon words were exchanged and Ragland fought with Pierce.[8] In her trial testimony, Bostick did acknowledge that she had selected the defendant Ragland's photograph from the array displayed to her in the September 26, 2000, interview with the Boston detectives at the Providence police headquarters. However, she denied that the individual so identified in the photograph (the defendant Ragland) held a knife and stabbed Pierce.

Bostick explained the change in her trial testimony on the basis that she had exaggerated her descriptions to the grand jury and to the detectives when she became aware of the substantial media attention the case had received. (The victim, Paul Pierce, is a basketball player for the Boston Celtics.) Further, according to this explanation, Bostick said she had embellished when she

evasive answers, and, then, when pinned down by the prosecutor with prior statements, gave answers that were directly at odds with and contradicted her prior statements and grand jury testimony — all as further described herein.

[8]That Bostick was disposed to recant her prior statements was foreshadowed in a statement which she signed some three months before trial during a meeting with one of the defense counsel. This statement was also the subject of inquiry during Bostick's trial testimony.

first recounted what she had seen at the Buzz Club to her college criminal justice class the day after the attack, and thereafter added details during her police interviews and in her grand jury testimony. She professed not to have realized the seriousness of giving evidence to a grand jury.

In light of her disavowals, the prosecutor confronted Bostick with her grand jury testimony. Bostick's prior inconsistent statements to the grand jury, because given under oath (and in accord with governing evidentiary principles, see part 1.b, *infra*), were introduced not just as impeachment of her credibility, but also as substantive evidence.

Thus, the prosecutor read into the trial record as substantive evidence, to be considered by the jury for the truth of the matters contained therein, excerpts of Bostick's grand jury testimony describing the defendant Ragland as possessing a knife and repeatedly stabbing Pierce during the attack. The excerpts so read into the trial record, in brief summary (full quotations from the grand jury testimony of the witness Bostick concerning the defendant Ragland are set forth in the Appendix to this opinion), included that Bostick saw Ragland initiate the attack upon Pierce, which was followed by "[m]ore men [who] began to jump in," joining Ragland in beating upon Pierce. At one point during the assault, Ragland pulled back. While he was standing "directly in front" of her, Bostick saw that Ragland had "pulled out the knife," which had a blade with a "jagged" edge. Then, according to Bostick's grand jury testimony, Ragland, armed with the knife, "went back into the fight" and "[s]tarted stabbing Paul Pierce" repeatedly in "[h]is stomach" and the "front half" of his body.

With the foregoing summary which juxtaposes Bostick's trial testimony against her inconsistent grand jury statements as backdrop, we now turn to analysis of the defendant Ragland's appellate challenges that there was not adequate corroboration for Bostick's recanted grand jury statements, and, therefore, that there was insufficient evidence that the defendant Ragland wielded a knife and repeatedly stabbed the victim Pierce, such as would support the defendant's conviction of assault and battery by means of a dangerous weapon.

b. *The legal standards governing admission of prior grand*

*jury statements as substantive evidence.* Bostick's grand jury statements were admitted and placed before the jury under well-established precedent developed in the Massachusetts common law of evidence. The principle is clear that, when a trial witness recants prior grand jury testimony, only to offer directly inconsistent statements in the witness's trial testimony, the prior inconsistent grand jury statements may be introduced at trial as substantive evidence, the truth of which may be weighed by the jury, so long as certain foundational requirements are present.[9]

The foundational requirements for the admissibility of the inconsistent grand jury testimony are that "(1) the witness can be effectively cross-examined at trial regarding the accuracy of the statement; and (2) the statement was not coerced and was more than a 'mere confirmation or denial of an allegation by the interrogator,' i.e., the statement must be that of the witness and not of the interrogator." *Commonwealth* v. *Clements*, 436 Mass. at 192, quoting from *Commonwealth* v. *Daye*, 393 Mass. 55, 73-74 (1984). In addition, a further requirement is that "when that testimony concerns an essential element of the crime, the Commonwealth must offer at least some corroborative evidence if there is to be sufficient evidence to warrant a conviction." *Id.* at 192-193. See, e.g., *Commonwealth* v. *Cong Duc Le*, 444 Mass. at 432, 435-442; *Commonwealth* v. *Figueroa*, 451 Mass. at 573-577. See also *Commonwealth* v. *Sineiro*, 432 Mass. at 741-742.

As analyzed in the *Clements* case — a decision which clarified and refined certain unclear references in prior case law concerning the substantive admission of inconsistent grand jury testimony — "the first [foundational requirements] relate to the admissibility of grand jury testimony, while the third concerns the sufficiency of evidence. Thus, only two factors must be satisfied for the evidence in question to be admitted for substantive purposes. Then, if that evidence concerns an element of the crime, there is a separate requirement that the Commonwealth must meet to sustain its burden on the element: there must be

---

[9]The same principles would apply on the civil side to the admission of prior inconsistent deposition evidence given under oath under Mass.R.Civ.P. 30, as amended, 428 Mass. 1401 (1998). See Proposed Mass.R.Evid. 801(d)(1)(A), quoted in note 2, *supra*.

other corroborating evidence on the issue." *Commonwealth* v. *Clements*, 436 Mass. at 193.[10]

In this case, the first two requirements are met. Indeed, neither the defendant Ragland (nor the defendant Watson, see part 2, *infra*), posits a challenge on these two fronts. That is to say, Bostick was available for cross-examination at trial; no evidence was adduced that her grand jury testimony had been coerced or that the testimony lacked detailed answers and was merely confirmation of information supplied by the interrogator.

It is the question of corroboration that lies at the heart of the defendants' challenges. In Ragland's case, because Bostick's grand jury testimony was material to "an element of the crime, [that is, placing the knife in Ragland's hand for the ABDW element,] there is a separate requirement that the Commonwealth must meet to sustain its burden on the element: there must be other corroborating evidence on the issue." *Commonwealth* v. *Clements*, 436 Mass. at 193.

c. *The evidence corroborating Bostick's recanted grand jury testimony.* The defendant Ragland argues that, as required by the aforecited precedent, there was not corroborating evidence introduced in the trial evidence to support Bostick's grand jury testimony. We determine otherwise. Based on our review of the trial record, we are convinced that sufficient corroboration of Bostick's grand jury testimony that Ragland had a knife and stabbed Pierce in the assault was established. In his challenge, the defendant Ragland fails to account for significant pieces of corroborative trial evidence consisting of (1) the testimony of Detective Barnicle, which fully (and without objection) described the statements that Bostick gave at the Providence police interview, which statements corroborate that the defendant Ragland used a knife to assault and stab Pierce; (2) the trial testimony concerning an out-of-court identification of the defendant Ragland by Bostick at the Providence police interview, in which Bostick selected Ragland's

[10]In *Clements, supra* at 193, the Supreme Judicial Court, citing as an example *Commonwealth* v. *Johnson*, 435 Mass. 113, 134 (2001), noted the imprecision in references in certain cases with respect to corroboration being a foundational requirement for the substantive admission of prior inconsistent statements given at the grand jury. To end that imprecision, the court "adopt[ed] this [above quoted] formulation despite statements to the contrary" appearing in certain previous cases discussing the admissibility of grand jury testimony.

photograph out an array and, in the course of the identification, stated to the detectives, according to Detective Barnicle's testimony, that it was this man who "stabbed the frontal area of Paul Pierce" with a switch blade knife having a "serrated edge"; (3) the trial evidence concerning the witness Regina Henderson, who saw blood on the defendant Ragland's hand just after the stabbing and the defendant's efforts to wash the blood off; (4) evidence introduced by other trial witnesses — who, while not seeing the defendant Ragland with a knife, nonetheless confirmed that the defendant Ragland was an attacker — indeed the lead attacker — on Pierce.

i. *The lack of objection to, and the substantive introduction of, Bostick's statements in the police interview.* As previously noted, Detective Barnicle was one of two police officers who interviewed Bostick at the Providence police station, the day after the assault at the Buzz Club. We set forth the detective's trial testimony which, *without objection*, was introduced in the Commonwealth's direct examination.

> *Q.*: "What information did she [Bostick] provide to you at that time?"

> *A.*: "Krystal Bostick told me that she had been, on Sunday evening, the twenty-fourth, had been a model, hair model, at a fashion show at Symphony Hall, a fashion show run by a woman by the name of Brigette Moses. And she stated that there was a party after the fashion show. The party was held at The Buzz Club. So she went to the Buzz Club with a friend and arrived there — I believe she told me she arrived there at about 11 p.m.

> "And she stated that at sometime after 12:30 p.m., she was in the area, in a room where there are two pool tables, and that she was talking to her friend. They were leaning up against the corner of the pool table when they were approached by Paul Pierce, and a very light, brief conversation ensued between the two of them. And she said that right aside Paul Pierce, who would be to her right, so away from the pool table, that would be in between the pool table and the windows, was a man that she called, interchangeably, she used a nickname of either Roscoe or

Rocco. And she said that at some point she heard Roscoe or Rocco say to Paul Pierce, 'What up, nigger?' and not in a friendly way. And he repeated it again and said, 'What's up, nigger?' And he then punched Paul Pierce, sending Pierce back, stunning him to the point where Krystal Bostick said he landed against her and almost hoarded himself against her.

"Then she said a bunch of people jumped in, a bunch of men. She said a bunch of men jumped in. And the action of the fight forced Pierce from the area of that first pool table near an aisle which leads from the dance floor across the room back towards a second pool table and near a railing."

*Q.*: "Did she say how far she was from this as it was happening? Did you ask her?"

*A.*: "About five feet."

*Q.*: "What else did she tell you?"

*A.*: "She said that she then saw the man she knew as Roscoe or Rocco pull a knife out of his right rear pocket. She described it as a flip knife, is what she said, which had a serrated edge. And she saw Roscoe or Rocco start to make punching motions towards the front of Paul Pierce's chest."

. . .

*Q.*: "What was the next thing that she told you?"

*A.*: "She stated that she then didn't see the man she knows as Trevor again, but that the man she knew as Roscoe or Rocco started walking around going — excuse me, but saying, 'Fuck that nigger, fuck them bitches. I'm the only man around here. Fuck them bitches. Fuck Paul Pierce.'

"And she said she then went outside. Everyone was told to get out of the club. And she went outside and once again, she was going to her car, and she saw the man she knew as Roscoe or Rocco get out of a — she described it as a long silver car with silver rims. She saw the man she knew as Roscoe or Rocco get out of the back seat."

Because there was no objection (on the grounds of hearsay or any other grounds), the above evidence of Detective Barnicle's description of Bostick's interview came in for all purposes. See *Commonwealth* v. *Ashley*, 427 Mass. 620, 627-628 (1998), citing *Commonwealth* v. *Luce*, 399 Mass. 479, 482 (1987). Therefore, this "in the record" substantive evidence is probative for all purposes, including as corroborative evidence. Further, there is no requirement that the corroborating evidence must be of a different nature from the grand jury testimony or that it emanate from a different witness. *Commonwealth* v. *Clements*, 436 Mass. at 195. Thus, the statements of Bostick, given at the Providence police interview, as introduced at trial for all purposes as substantive evidence, are a corroborative stanchion for the recanted grand jury statements.

ii. *The corroborating identification evidence.* Bostick's out-of-court identification of the defendant Ragland's photograph at the Providence police station also included information that the person whom she had identified as Ragland had possessed a knife and had stabbed the victim Pierce. This out-of-court identification by Bostick was introduced in the direct testimony of Detective Barnicle as follows.

> *Q.*: "And who was she [Bostick] able to identify on that photographic array, sir?"
>
> *A.*: "She identified the man in space number nine, William Ragland, as being Roscoe, the man she had seen first punch and then stab the frontal area of Paul Pierce."
>
> *Q.*: "During that interview, did she also have occasion to draw a diagram of a blade?"
>
> *A.*: "She did."
>
> *Q.*: "And what type of blade did she draw?"
>
> *A.*: "One with a serrated edge."
>
> *Q.*: "Did she sign that sheet, the one in front of you?"
>
> *A.*: "Yes."

*Q.:* "Where did she sign it?"

*A.:* "She circled number nine. She initialed the circle around number nine. She signed her full name, gave her signature as the witness, on September 26, the year 2000, 6:30 p.m., and I witnessed it."

*Q.:* "And that was the day after Paul Pierce got stabbed at The Buzz Club?"

*A.:* "Yes, sir."

Although an obvious point, we observe that this identification (as were Bostick's statements to the police referred to in part 1.c.i, *supra*) occurred precedent to, and was a separate legal event from, Bostick's grand jury testimony. Such an out-of-court identification is introducible as, and in this case was admitted as, substantive evidence in its own right. This is so even if a witness renounces aspects of the identification, offers testimony at trial that differs in material respects from the out-of-court identification, or does not acknowledge the identification. Indeed, the acceptance as substantive evidence of a prior out-of-court identification by a witness who in some manner renounces or does not acknowledge his or her prior out-of-court identification was precisely the modification of *Commonwealth* v. *Daye, supra,* which was announced in *Commonwealth* v. *Cong Duc Le,* 444 Mass. at 432. To this end, the Supreme Judicial Court held as follows: "[T]he limitations *Daye* placed on the use of extrajudicial identification evidence should be modified in light of subsequent jurisprudence on this subject. Proposed Mass.R.Evid. 801(d)(1)(C) provides that a statement is not hearsay if '[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . one of identification of a person [made] after perceiving him.' " *Id.* at 436-437.[11]

The substantive evidentiary effect of Bostick's out-of-court

---

[11]The "limitations" imposed by *Daye* restricted the introduction as substantive evidence of a prior out-of-court identification disavowed by a witness during in-court testimony or acknowledged in the witness's trial testimony, but in a manner which ascribed materially different meaning to the prior out-of-court identification. The *Daye* limitations rested on concerns that substan-

identification of the defendant Ragland, including the statements embedded in that identification that Ragland had a serrated-edge switch knife in his hand and repeatedly stabbed Pierce with the knife, is another corroborative stanchion for the recanted grand jury statements. "The fact that the 'other [corroborating] evidence' is a recanted, extrajudicial identification does not disqualify it as sufficient to meet the 'other evidence' requirement. We [the Supreme Judicial Court] have never held that the other evidence must be of a different nature from the grand jury testimony or that it emanate from a different witness. We decline to do so now." *Commonwealth* v. *Clements*, 436 Mass. at 194-195.

iii. *The corroborating evidence of blood on the defendant Ragland's hands.* The trial evidence included another eyewit-

---

tive admission of the out-of-court identification might impinge upon constitutional rights of confrontation. However, both the United States Supreme Court and the Supreme Judicial Court have determined that there is no confrontation violation in the substantive admission of the out-of-court identification, even if renounced by the witness. Resolving this issue, the Supreme Judicial Court wrote in *Commonwealth* v. *Cong Duc Le*, 444 Mass. at 437-438, as follows:

> "The argument that a literal reading of rule 801(d)(1)(C) [providing for admission of the out-of-court identification as substantive evidence] would violate the confrontation clause was later rejected by the United States Supreme Court. *United States* v. *Owens*, 484 U.S. 554, 559-563 (1988). There, the victim witness (who had suffered severe head injuries during the attack in question, resulting in significant memory loss) still had a memory of making a prior identification, but had no recollection of the basis for his identification, no recollection of even seeing the attacker, and no recollection of what had been said to him that might have made the prior identification of the defendant impermissibly suggestive. *Id.* at 556. . . . On appeal, the defendant claimed that the victim's memory loss was such that he had been denied an effective opportunity to cross-examine him on the subject of the identification, in violation of the confrontation clause . . . . The Court disagreed. As to the confrontation clause, all that was required was that the defendant have an opportunity to cross-examine the witness — it did not guarantee a 'cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' *Id.* at 559, quoting *Kentucky* v. *Stincer*, 482 U.S. 730, 739 (1987). As to the requirement under the rule that the witness be 'subject to cross-examination concerning the statement' of identification, Fed.R.Evid. 801(d)(1)(C), [and under the proposed Mass. R.Evid. 801(d)(1)(C),] that requirement would be satisfied as long as the witness 'is placed on the stand, under oath, and responds willingly to questions.' *United States* v. *Owens, supra* at 561."

ness to the attack. Although this witness, Regina Henderson, did not see the defendant Ragland with a knife, she did see blood on the defendant Ragland's hands — blood which the defendant sought to wash away immediately following the attack upon Pierce. This was as Henderson testified to the grand jury. However, (as with Bostick), at trial, there was a recantation by Henderson of parts of her grand jury testimony. In her trial testimony, Henderson gave inconsistent statements, limiting what she had seen that at the Buzz Club only to the fact that she had seen that the defendant Ragland "was fighting with Paul Pierce."

Given this recantation, and for the reasons previously set out (in part 1.b, *supra*), Henderson's inconsistent grand jury statements also came in as substantive evidence.[12] Thereafter, having been confronted with these inconsistent grand jury answers, at a later juncture in her trial testimony, Henderson changed course and acknowledged having seen blood on the defendant Ragland's hand. The ensuing trial testimony by Henderson was as follows.

> *Q.:* "Well let me ask you this. After the fight, what did you see Roscoe do?"
>
> *A.:* "He went into the bathroom and washed his hands."
>
> *Q.:* "Okay. And what did you hear him saying when he went to the bathroom to wash his hands?"
>
> *A.:* " 'Who will be the next victim.' "
>
> *Q.:* "And what did you see on his hands?"
>
> *A.:* "A little bit of blood."

The prosecutor then introduced additional parts of the grand jury testimony:

---

[12]In light of the recantation, the prosecutor read, and introduced as substantive evidence, parts of Henderson's grand jury testimony, as follows.

> *Q.:* " 'Now this person, Roscoe, what did you see him do?'
>
> "Your answer, 'He was kicking him and after they broke up the, they broke up the fight, he had blood on his hands.' "
>
> *A.:* "Okay. Yeah."

*Q.*: "My question, Ms. Henderson, 'And did you see any blood on his hands when he came out of the bathroom?'

"Your answer, 'No he had washed his hands.' "

Henderson testified that she did not see Ragland with a knife. However, her testimony that she did see the defendant Ragland with blood on his hands, near the knuckles as she explained, coupled with her testimony that the defendant washed the blood from his hands, tended strongly to corroborate that the defendant Ragland had held in his bloodied hands a knife which he had used in his attack upon the victim Pierce.

In further corroboration (similar to the identification corroboration regarding the witness Bostick, see part 1.c.ii, *supra*), at trial, Henderson acknowledged that she had made an out-of-court photographic identification of, and also made an in-court identification of, the defendant Ragland as the man she had seen fighting with Pierce. Thus, the Henderson evidence is another corroborative stanchion for the recanted grand jury statements.

iv. *Other corroboration.* The victim Paul Pierce, while in the hospital, identified the defendant Ragland as one of his attackers. Pierce confirmed this identification at trial. Indeed, the trial evidence strongly demonstrated that the defendant Ragland was the leader in the attack upon Pierce. In addition to the evidence that did ultimately emerge by and through the witnesses Bostick and Henderson, other trial witnesses who were at the Buzz Club also pointed to the defendant Ragland as the major protagonist in the assault. For example, the two men who served as bouncers and security detail at the Buzz Club — and who finally broke up the fray and carried Pierce, now bloodied and down from the assault and stabbing, to a nearby back door — identified, and described, the defendant Ragland as pursuing the injured Pierce to beat upon him one last time. The foregoing provides yet another corroborative stanchion for the recanted grand jury statements.

d. *Conclusion.* Recognizing the obvious strength of the evidence implicating the defendant Ragland in the attack, trial counsel conceded in his closing argument that Ragland "did get into an altercation with Paul Pierce," but contended that this

involvement "does not make him a stabber." However, this defense theory of the case — that there was insufficient evidence that the defendant Ragland held a knife and was the stabber — does not stand up against the trial record described herein. Moreover, the appellate arguments which the defendant Ragland advances as to why his conviction should be set aside, in large measure, are directed more to a contest of the credibility of the witnesses and the weight of the evidence. But these are not the measures to test the legal sufficiency of the evidence. In appellate scrutiny of the sufficiency of the evidence, "the weight or credibility of the evidence adduced by the prosecution is largely irrelevant." *Commonwealth* v. *Tanner*, 66 Mass. App. Ct. 432, 436-437 (2006), citing *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980) (weight of evidence not ordinarily subject to review on appeal). The task of assessing the cogency of evidence and resolving conflicting testimony, with rare exceptions not applicable here, is the exclusive province of the jury.[13] See *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981).

Rather, on appellate review it is the standard of *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979), which controls: The "critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . [is] to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. . . . [T]he question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis original). *Ibid.*, quoting from *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979).

For all the reasons we have addressed, applying the *Latimore* standard, we conclude that, viewed in totality, the trial evidence

---

[13]The trial judge's instructions squarely placed the issue of credibility before the jury:

"Unless the witness changes his or her testimony and adopts the earlier statement as true, you must not consider the earlier statement as evidence or proof of any fact contained in that statement. . . . There is an exception to this rule [on prior statements] and it involves the testimony given before a grand jury under oath. If you find that testimony credible, then you may consider that testimony substantively, that is, for the matters asserted in that prior testimony."

was sufficient. Accordingly, the defendant's challenge to his conviction of assault and battery by means of a dangerous weapon fails.

2. *The defendant Watson.* Watson takes a slightly different tack from the lack of corroboration challenge and contest to the sufficiency of the evidence arguments posed by the defendant Ragland.

With respect to the defendant Watson, we begin in part 2.a by setting forth the conflicts and inconsistences in the various statements and sworn grand jury testimony of Bostick concerning what she witnessed concerning the defendant Watson's acts during the attack on the victim Pierce; and we next set forth, in part 2.b, analysis of the claim asserted by the defendant Watson that the evidence was at equipoise, and hence presented an equal "hypothesis of [his] innocence."

a. *The witness Bostick's conflicting trial testimony, prior statements, and grand jury testimony concerning the defendant Watson.* As previously noted, there was also recantation by Bostick of the incriminatory testimony she had given against the defendant Watson before the grand jury and in statements to the detectives at the Providence interview.

In the grand jury proceedings, Bostick described Watson as attacking the victim Pierce from behind and, during this attack, wielding a smooth-edged knife attached to brass knuckles. In her September 26, 2000, interview at the Providence police department, Bostick told Detective Barnicle and his colleague that she had also seen a man known to her as "Trevor" stab the victim in the back. Bostick identified a photograph in an array. The man Bostick identified as Trevor is the defendant Watson.

At trial, Bostick acknowledged only that she had seen the defendant Watson at the Buzz Club on the night in question. She denied that she had seen Watson involved in any aspect of the altercation or in possession of a knife. In light of these disavowals, the prosecutor read into the trial record as substantive evidence the inconsistent grand jury statements that Bostick had given with respect to the defendant Watson's role in the attack upon Pierce. The grand jury excerpts read into the trial record included testimony that at the same time the defendant Ragland was attacking Pierce from the front, the defendant Watson was

behind Pierce "try[ing] to pull him down from the neck"; then, Watson lost his grip and "fell off" Pierce; when Watson reentered the fray, he held a smooth-edged knife attached to brass knuckles and tried to stab Pierce. (Full quotations from the grand jury testimony of the witness Bostick concerning the defendant Watson are set forth in the Appendix to this opinion.)

b. *The defendant's equally-split evidence claim.* The defendant Watson asserts that, even assuming that Bostick's grand jury testimony was properly admitted as substantive evidence, implicating him as a participant in the attack upon Pierce, his conviction of assault and battery is still not sustainable. This defendant relies on the axiom that "[w]hen the evidence tends equally to sustain either of two equally inconsistent propositions, neither of them can be said to have been established by legitimate proof." *Smith* v. *First Natl. Bank*, 99 Mass. 605, 612 (1868). From this proposition, the defendant Watson argues that because Bostick repudiated her grand jury testimony and provided a plausible reason for her recantation (i.e., the embellishment explanation), the recantation left "an equally reasonable hypothesis of innocence."

The concept the defendant Watson relies on is inapposite and is limited "only to situations in which *any view* of the Commonwealth's evidence, however favorable, still requires a leap of conjecture with respect to essential elements of the crime charged in order to obtain a conviction" (emphasis supplied). *Commonwealth* v. *Latney*, 44 Mass. App. Ct. 423, 426 (1998). Here, Bostick's grand jury testimony required no such leap to reach proof of the elements of the assault and battery offense of which the defendant Watson was convicted. Bostick's grand jury testimony admitted as substantive evidence was not susceptible of an innocent presentation of the defendant Watson. Rather, embedded in the material parts of that grand jury testimony introduced at trial were incriminatory and probative predicates for each of the elements of proof of the offense of assault and battery. This is not a case wherein the same grand jury, "evidence tend[ed] equally to sustain either of two inconsistent propositions." *Smith* v. *First National Bank, supra.*

In sum, contrary to the defendant Watson's argument, the grand jury testimony did not yield, and does not sustain, an

"equally and inconsistent" exculpatory version of the offense. Rather, the grand jury testimony of Bostick introduced substantively served to prove and confirm that the defendant Watson perpetrated an assault and battery during the attack on Pierce.[14,15]

3. *Other appellate arguments.* a. *Prosecutor's closing argument.* Both defendants argue that the following remarks in the prosecutor's closing argument improperly suggested that Bostick recanted her grand jury testimony at trial because she was afraid of the defendants.

> "Getting back to [Bostick's trial] testimony . . . and that recanted version . . . . What's different between October third in the year 2000 to when she testified before you last week? What's different? Grand jury, private proceeding, under oath, just like she's under oath here. No one's there. Mr. Watson, Mr. Ragland . . . , no one's there. She makes the identification. She's gone down that path just like Regina Henderson was going to go down that path two days later. They can't take it back."

The comments are ambiguous in that the prosecutor did not in direct terms speak of the witness being placed in fear or threatened by the defendants. From this ambiguity, the Commonwealth argues that the language was merely meant to convey that Bostick was less than truthful when she had to testify in the physical presence of the defendants than she had been in her grand jury testimony. However, notwithstanding the lack of an open refer-

---

[14]We note in passing that the conflicting versions of Bostick's statements — grand jury versus testimony rendered at trial — in particular, the conflict on the point whether the defendant Watson did, or did not, have a knife, may have been more telling to the jury. Suffice it to state that, unlike the proof presented as to the defendant Ragland, there was not the same depth of corroboration to prove that the defendant Watson had a knife. Accordingly, the jury may have concluded that as to the defendant Watson there was not adequate corroboration for Bostick's recanted grand jury testimony concerning the element of possession of the dangerous weapon, a knife. Therefore, the jury acquitted the defendant Watson of the greater charge of assault and battery by means of a dangerous weapon, while convicting him of the lesser charge of assault and battery.

[15]We also note that two defense witnesses called by the defendant Ragland also confirmed that the defendant Watson was present at the club on the night of the attack.

ence to threats, there is an ominous import implicit in the inartful remarks — a darker connotation suggesting fear emanating in response to the defendants. Accordingly, the defendants' criticism of the language is well taken.

Even assuming error in the prosecutor's comment because of such a darker connotation in his words, such an error would not warrant reversal in this case.[16] First, the very ambiguity in the remarks rendered them much less damaging than an overt statement of threats or fear being induced by the defendants would have been. In other words, the vagaries in the words, in and of themselves, produced a diminished effect not likely to lead the jury to ponder whether the defendants had made threats which caused the recantation. Second, the jury could full well see Bostick and assess her explanation for the recantation — which did not suggest any generation of fear. Third, the judge carefully instructed the jury before the trial began and twice during his final instructions that closing arguments are not evidence.[17] Fourth, "[a] certain measure of jury sophistication in sorting out excessive claims on both sides fairly may be assumed." *Commonwealth* v. *Kozec*, 399 Mass. 514, 517 (1987). In this case, reflective of "jury sophistication" vis-à-vis these prosecutorial comments are the discriminating jury verdicts. The jury acquitted both of the defendants of the most serious charges being tried. The defendant Ragland was acquitted of assault with intent to murder; the defendant Watson was acquitted of assault with intent to murder and of assault and battery by means of a dangerous weapon.[18]

b. *The jury question.* Upon concluding his final instructions

[16]We pretermit the question whether Ragland properly preserved the issue because under either standard — the prejudicial error standard for preserved error or the substantial risk of a miscarriage of justice standard for nonpreserved error — the outcome is not altered.

[17]Watson also argues that the prosecutor improperly gave his personal opinion when he told the jury Bostick was lying at trial. The page he cites in the transcript contains no such language, and to the extent that the prosecutor elsewhere used the word "lying" or "lie" it was clearly in an argumentative context and therefore proper. See *Commonwealth* v. *Chavis*, 415 Mass. 703, 712-714 (1993); *Commonwealth* v. *Ortega*, 441 Mass. 170, 181 (2004) ("[D]efense counsel raised the issue of credibility of the police witnesses' testimony, and it was proper for the prosecutor to argue from the evidence why these witnesses should be believed . . .").

[18]After the submission of his brief, the defendant Ragland filed a motion to

to the jury, the trial judge spoke with counsel and then gave several supplemental instructions to the jury, including the following.

> "[Y]ou also heard that Ms. Bostick, when she testified, that she recanted her grand jury testimony, was aware in doing so it was adverse to her penal interest. You may consider whether or not a reasonable person would make a statement which at the time of its making tended to subject the declarant to criminal liability unless she believed it to be true."

During deliberations, the jury sent a question, "What is the punishment for perjury?" After consulting with all of the parties and, with their agreement, the judge sent a written statement to the jury that they "are not to concern themselves with any punishment for any crime." On appeal Ragland argues that the judge erred in failing to answer the jury's question. There was no error.

The defendants were not entitled to the initial instruction. There was no evidence before the jury that Bostick knew that recanting her grand jury testimony was adverse to her penal interest. While the transcript shows that Bostick responded affirmatively when a single question was posed concerning whether she knew that she was admitting to perjury when she said she lied to the grand jury, the question and answer were objected to and the objection was sustained. The judge thereby removed the question and answer from the jury's consideration. The judge had instructed the jury before trial to disregard any testimony to which he sustained objections and to draw no inferences, favorable or unfavorable, from a party's objections. See *Commonwealth* v. *Sullivan*, 435 Mass. 722, 732 (2002). We presume that the jury follow the

add a challenge based on Federal law to the prosecutor's closing argument. The additional Federal challenge claim is that the alleged error in the prosecutor's closing argument violated the Fifth and Fourteenth Amendments to the United States Constitution and denied the defendant his Federal due process right to a fair trial. We allow the motion to add the additional argument. However, this federally based challenge does not change the result we reach. The Massachusetts and United States constitutional standards of review of alleged error in a prosecutor's closing argument are, in the main, congruent and for the reasons stated above, the newly added Federal challenge to the prosecutor's closing argument is unavailing.

judge's instructions. *Commonwealth* v. *Jackson*, 384 Mass. 572, 579 (1981).

Absent proof that Bostick knew that recanting her grand jury testimony had penal consequences, there was no basis for the jury to consider what those penal consequences might be. "A judge is not required to charge as to 'factual situations which are speculative or conjectural and which are unsupported by evidence.' " *Commonwealth* v. *Remedor*, 52 Mass. App. Ct. 694, 705 (2001), quoting from *Commonwealth* v. *Cook*, 419 Mass. 192, 202 (1994). "In essence, the judge gave the defendant an instruction that was more favorable than warranted by the evidence." *Commonwealth* v. *Remedor*, *supra*.

Moreover, even if we were to conclude that the initial instruction was properly given, it required no amplification. "The proper response to a jury question is within the discretion of the judge." *Commonwealth* v. *Scott*, 428 Mass. 362, 366-367 (1998). Unlike the situation presented in *Commonwealth* v. *Davis*, 52 Mass. App. Ct. 75, 77, 78 n.6 (2001), the case upon which Watson relies, the judge responded to the jury's question only after consulting with all the parties and obtaining their agreement, and the answer the judge gave did not mislead the jury. The question the jury asked made it clear that they were considering Bostick's credibility in relation to whether her trial testimony may have put her at risk of criminal liability. Because, however, no charges were pending against Bostick, nor was there any suggestion by any party that such charges were or are being contemplated, the specific penalty for one of those potential charges is collateral to an assessment of Bostick's credibility. The judge properly exercised his discretion in responding to the inquiry as he did, and even if we were to conclude otherwise, any error does not create a substantial risk of a miscarriage of justice.

*Judgments affirmed.*

APPENDIX.

A. *The defendant Ragland.* The following, in pertinent part, are quotations from the grand jury transcript of the testimony of the witness Bostick concerning the defendant Ragland, as read into the trial record for substantive consideration by the jury. This sequence follows an exchange between Bostick and the prosecutor wherein Bostick denied having seen and focused on Ragland as the attack upon Pierce commenced.

*Q.*: "What did you see Roscoe do at that point?"

*A.*: "I really didn't focus in on Roscoe. I was just looking at a lot of people fighting."

. . .

*Q.*: "My question, ma'am, to you, line 13 [in the transcript of the grand jury proceedings], 'What did you see happening as the fight went to the other side of that pool table?' Your answer, 'More men began to jump in the fight, and it went from back and forth from one side of the railing —' "

DEFENSE COUNSEL: "Objection, Your Honor."

THE COURT: "Overruled."

*Q.*: " 'Just back and forth near the pool table, away from the pool table, and I saw Rocco, which is the member who initiated the fight, he was in it, and then he jumped back out directly in front of me, so his back is towards me, pulled out the knife and went back into the fight.' Did I read that accurately?"

*A.*: "Yup."

*Q.*: "Where did he pull the knife out from, Ms. Bostick?"

*A.*: "I didn't see him with one."

*Q.*: "Excuse me?"

*A.*: "I said I didn't see him with one."

THE PROSECUTOR: "May I approach, Your Honor?"

THE COURT: "Yes."

*Q.*: "My question to you, ma'am, next question [in the grand jury proceedings], 'Where did he pull out the knife from?' Your answer, 'Out of his back pocket.' Did I read that accurately?"

*A.*: "Yes."

*Q.*: "What did you see him do with that knife?"

*A.*: "I didn't see him with one."

*Q.*: "I asked you that question in the grand jury, ma'am, line 24, 'What did you see him do with this knife?' And your answer, top of page 32, 'He switched it out.' Did I read that accurately?"

*A.*: "Yes."

*Q.*: "Did you see which hand he pulled it out with?"

*A.*: "I didn't see him with one."

*Q.*: "Do you recall me asking you that question in the grand jury?"

*A.*: "No."

*Q.*: "My question to you, ma'am, back when you testified in the grand jury under oath, 'Did you see which hand he pulled it out with?' And your answer, 'His right hand.' Did I read that accurately, lines 4 and 5?"

*A.*: "Yup."

*Q.*: "And my next question [in the grand jury], 'Did he pull it out from his —' And your answer, 'Right back pocket.' Did I read that accurately?"

*A.*: "Yup."

*Q.*: "Now, the knife, did you see how long the blade was?"

*A.*: "I didn't see him with one."

*Q.*: "My question to you, next question to you in the grand jury, Ms. Bostick, 'Now, this particular knife that you saw, did you see how long the blade was?' And your answer, line 10, 'Yeah, it was a long silver blade with the little ridges on the blade.' Did I read that accurately?"

*A.*: "Yup."

*Q.*: "Next question [in the grand jury], 'So, was the edge of the blade jagged or smooth?' And your answer, 'Jagged.' Did I read that accurately?"

*A.*: "Yes."

*Q.*: "My next question [in the grand jury], 'After he had taken out the knife, how far away was he from Paul Pierce?' And your answer, 'Probably about five feet, cause it was men in front of him once he jumped out the fight there was more men fighting him so.' Did I read that accurately?"

*A.*: "Yup."

*Q.*: "And my next question, [at the grand jury] 'In front of who?' And your answer, 'Rocco.' Is that accurate?"

*A.*: "Yup."

*Q.*: "What did you see him do? What did you see Roscoe do?"

*A.*: "I didn't see him do anything."

THE PROSECUTOR: "May I approach, Your Honor?"

THE COURT: "Yes."

*Q.*: "Lines 21 and 22 [in the grand jury], Ms. Bostick, 'What did you see him do?' Your answer, 'He went back into the fight.' Did I read that accurately?"

*A.*: "Yup."

*Q.*: "Next question [in the grand jury], 'What did you see him do at that point?' Your answer, the bottom of page 32 when you were under oath in the grand jury, 'Started stabbing Paul Pierce. At this point Paul was like trying to cover his face with his jacket and his hands.' Did I read that accurately?"

*A.*: "Yup."

*Q.*: "Top of page 33, ma'am?"

*A.*: "Okay; yup."

*Q.*: "Next question [in the grand jury], 'When you saw him make that stabbing motion towards Paul Pierce, what part of his body did you see him?' And your answer, 'His stomach, his front half.' Did I read that accurately?"

*A.*: "Yup."

*Q.*: "And my next question [in the grand jury], 'Did you actually see Paul Pierce getting stabbed?' Do you recall what your answer was?"

*A.*: "No."

*Q.*: "Your answer was, line 7, when you were under oath in the grand jury, 'Yeah.' Did I read that accurately?"

*A.*: "Yup."

*Q.*: "Did you see how many times he made that motion, that thrusting motion?"

*A.*: "Who?"

*Q.*: "Roscoe."

*A.*: "No, because I didn't see Roscoe with a knife."

*Q.*: "Do you recall me asking that question in the grand jury, ma'am?"

*A.*: "Yeah."

*Q.*: "Question [in the grand jury], 'Did you see how many times he made that motion, that thrusting motion?' Your answer, 'Yeah, repeatedly, just real fast, a lot of times.' Did I read that accurately?"

*A.*: "Yup."

B. *The defendant Watson.* The following, in pertinent part, are quotations from the grand jury transcript of the testimony of the witness Bostick concerning the defendant Watson, as read into the trial record for substantive consideration by the jury.

*Q.*: "Do you recall me asking you next, 'What did you see Trevor doing?' "

*A.*: "No."

*Q.*: "Page 36 again, ma'am, when you were under oath in the grand jury on October third of 2000, line 16, 'What did you see Trevor doing?' Line 17, your answer, 'Trevor went around to the back of Paul Pierce and tried to pull him down from his neck, and when Paul Pierce raised up, it almost like, it like broke Trevor away from him and he fell off him, then came back with his knife.' Did I read that accurately?"

*A.*: "Yup."

*Q.*: "Ms. Bostick, when you say, 'came back with his knife,' tell us about that. What do you mean?"

*A.*: "I didn't see him with a knife."

*Q.*: "Do you recall me asking you that in the grand jury?"

*A.*: "No. I don't remember anything from the grand jury testimony so you might as well stay here."

*Q.*: "Next question, Ms. Bostick, 'When you say he came back with his knife, tell us about that.' And your answer, 'He had a black knife; I saw the brass knuckles, like it was black with little brass knuckles on it.' Did I read that accurately?"

*A.*: "Yup."